Williams, Judge,
delivered the opinion of the court:
Congress by the act of March 3, 1925 (43 Stat. 1133), conferred jurisdiction on the court, “ notwithstanding the lapse of time or statutes of limitations, to hear, examine, and adjudicate and render judgment in any and all legal and equitable claims which said Kansas or Kaw Tribe of Indians may have or claim to have against the United States, growing out of or arising under any treaty or agreement between the *297 United States and tlae Kansas or Kaw Tribe of Indians, or arising under or growing out of any act of Congress in relation to Indian affairs, which claims have not heretofore been determined and adjudicated on their merits by the Court of Claims or the Supreme Court of the United States; * *
The act of March 3, 1925, was amended and reenacted by the act of February 23, 1929 (45 Stat. 1258). The amenda-tory act is set out in full in finding II and its detailed provisions need not be restated here. Under the authority of this act the plaintiff tribe, on April 5, 1930, filed its second amended petition, upon which the case is heard.
The plaintiff Indians are a branch of the Osage division of the Siouan Indian stock. Originally their home was on the Ohio and Wabash Rivers, where they, together with the Quopaw, Omaha, Ponca, and Osage formed one tribe. Long before the coming of the white man this group had become split into five separate and distinct tribes and had migrated from their ancient home to various points along the Mississippi and Missouri Rivers, plaintiff’s villages being on the Missouri. The plaintiff tribe was subsequently driven from their villages on the Missouri River by the Iowas and Sacs, and at the time the treaty of 1’825 was entered into was living in two villages on the Kansas River. The tribe at that time, and from the time it was first known to the white man, claimed and hunted over a vast region drained by the Kansas River and its tributaries, as is shown by numerous maps of the period 1672 to 1819. They were at that time “ blanket ” Indians, and like all Indians of that class, were illiterate and unskilled in the arts of civilization. Very few of them could speak or understand the English language, they had no knowledge or understanding of the units of measure of land, and understood the desorption of a tract of land only in the terms of its natural boundaries. They depended almost entirely upon hunting, trapping, and fishing for their support and maintenance. Their chief source of supply for the necessities of life were the herds of buffalo which abounded in great numbers in the territory occupied by them, especially the western portion of the area.
The petition sets forth eight separate and distinct claims or causes of action upon which a judgment hi the sum of *298 $97,301,230.93 is prayed. In tbe plaintiff’s suggested findings of fact the demand is grouped into nine separate items or claims, and the demand is reduced to $47,530,398.65. The additional claim is based on the demand for an accounting made in the petition.
The first five claims asserted in the petition arise under the treaty of June 3, 1825 (7 Stat. 244) and are:
1. The alleged inadequacy of the consideration for the lands ceded to the United States in the first article of the treaty. The amount claimed in the petition is $29,878,223.45, which amount is reduced to $5,000,000.00 in the plaintiff’s suggested findings of fact.
2. The alleged failure of the United States to furnish and provide a blacksmith as stipulated in article 4. The amount claimed in the petition is $231,000.00, which sum is reduced to $63,558.79 in the suggested findings of fact.
3. Claim for reimbursement of the sum of $9,749.20 expended out of plaintiff’s funds for “ payment for farmers ”, which amount it is asserted the United States was obligated to pay under the fourth article of the treaty.
4. This claim arises under article >5 of the treaty and is predicated on the alleged failure of the United States to lay off and sell 36 sections of good land on the Big Blue River for the purpose of raising a fund to be applied to the support of schools for the Kansas children within the Kansas Nation. In the petition $300,000 is claimed on this account. In the requested findings of fact the amount is reduced to $129,524.65, with interest at the rate of 5 percent per annum to the date of filing the petition, or a total sum of $297,906.70.
5. This claim is for the value of lands in addition to those ceded to the United States in the first article of the treaty, which it is alleged the plaintiff tribe then had title to and occupied, and which the United States has since unjustly taken possession of and sold or otherwise disposed of. The amount claimed on this item in the petition is $12,500,000.00. In the suggested findings of fact and brief the claim is reduced to $2,000,000.00.
The sixth and seventh claims arise under the provisions of the treaty of January 14, 1846 (9 Stat. 842) and are:
*299 6. This claim is based on the alleged inadequacy of the-consideration for the lands ceded to the United States in the first article of the treaty. The amount claimed in the petition is $2,298,000.00. In the brief the claim is reduced to $2,150,000, and in the alternate, as the minimum amount due, to $100,000, with interest at 5 percent from 1846 to 1928, or $460,000.00.
7. This claim is for the difference between the value of the lands conditionally ceded to the United States in article 5 of the treaty and the value of the Council Grove Reservation, and is predicated on the contention that the conditional cession never became operative, and that title to the lands never became vested in the United States. The amount claimed in the petition is $10,930,181.69 and in the plaintiff’s suggested findings of fact $10,762,307.00.
8. This claim, stated in the petition to be $300,000.00, and increased in the plaintiff’s suggested findings of fact to $878,-113.35, grows out of the sale of the Council Grove Reservation. It is alleged that the United States has failed to sell all the lands, has failed to devote all the proceeds of sales to the benefit of the plaintiff, and has unlawfully diverted a large portion of such proceeds to unauthorized uses.
9. This claim is for a share in the lands and revenues derived from the sale of town sites, grazing leases, oil royalties and leases, etc., in the Osage Reservation in Indian Territory established by the act of June 5, 1872, proportional with the numbers of the plaintiff tribe to the Osage Tribes. The amount claimed in the petition is $40,863,825.79, which amount is reduced to $26,368,763.61 in plaintiff’s suggested findings of fact and brief.
The several claims will be considered in the order heretofore stated.
1. By article 1 of the treaty of 1825 the plaintiff ceded to the United States all the lands lying within the State of Missouri, to which the tribe then had title or claim, and also ceded and relinquished to the United States all other lands which plaintiff then occupied or to which they had title or claim, lying west of the State of Missouri and within the following boundaries:
*300 “ Beginning at the entrance of the Kansas River into the Missouri River; from thence north to the northwest corner of the State of Missouri; from thence westwardly to the Nodewa River, thirty miles from its entrance into the Missouri ; from thence to the entrance of the Big Nemahaw into the Missouri'and with that river to its source; from thence to the source of the Kansas River, leaving the old village of the Pania Republic to the west; from thence, on the ridge dividing the waters of the Kansas River from those of the Arkansas, to the western boundary of the State line of Missouri, and with that line, thirty miles, to the place of beginning.”
It was provided in article 2 of the treaty that from the lands ceded in the first article a reservation should be made for the use of the plaintiff of a tract of land “ to begin twenty leagues up the Kansas River, and to include their village on that river; extending west thirty miles in width, through the lands ceded in the first Article ” to be surveyed and marked under the direction of the President, and to such extent as he might deem necessary, and at the expense of the United States.
The excess of the lands ceded to the United States in the first article of the treaty over the lands reserved for the use of the plaintiff in the second article was approximately 20,000,000 acres. It is contended by the plaintiff that the consideration for the cession of this territory, provided in the treaty, was wholly inadequate, and that as the relation of guardian and ward was established between the United States and plaintiff by article 3 of the treaty of October 28, 1815 (7 Stat. 137), the United States could not legally dr equitably receive from the plaintiff a cession of its lands without payment of the full, fair, and reasonable value of such lands.
Pursuant to the provisions of the Treaty of Ghent between the United States and Great Britain, ratified February 17, 1815 (8 Stat. 218), the United States entered into a treaty of peace and friendship with the plaintiff tribe on October 28, 1815. The purpose of the treaty as proclaimed in the preamble was the reestablishment of peace and friendship between the United States and the plaintiff tribe of Indians and placing them in every respect upon the same footing upon which they stood before the late war (the War of 1812) between the. *301 United States and Great Britain. Article 1 provided that every injury or act of hostility by one or either of the contracting parties against the other should be mutually forgiven and forgot. Article 2 provided that there should be perpetual peace and friendship between all the citizens of the United States and all the individuals composing the Kansas Tribe, and that the friendly relations existing'between them before the war be renewed. Article 3 acknowledges the Kansas Indians “ to be under the protection of the United States of America, and no other nation, power, or sovereign, whatsoever.” It is this provision which the plaintiff says created the legal relationship of guardian and ward between the United Statés and the Kansas Indians. Similar stipulations are found in many treaties between the United States and Indian tribes, both before and after the date of the treaty under consideration. It is also found in Indian treaties with Great Britain prior to the separation of the United States from that country. In discussing the origin and meaning of this stipulation Chief Justice Marshall, in Worcester v. The State of Georgia, 6 Pet. 515, said:
“ It was introduced into their treaties with Great Britain; and may probably be found in those with other European powers. Its origin may be traced to the nature of their connection with those powers; and its true meaning is discerned in their relative situation.
“ The general law of European sovereigns, respecting their claims in America, limited the intercourse of Indians, in a great degree, to the particular potentate whose ultimate right of domain was acknowledged by the others. This was the general state of things in time of peace. It was sometimes changed in war. The consequence was that their supplies were derived chiefly from that nation and their trade confined to it. Goods indispensable to their comfort, in the shape of presents, were received from the same hand. What was of still more importance, the strong hand of government was interposed to restrain the disorderly and licentious from intrusions into their country, from encroachments on their lands, and from those acts of violence which were often attended by reciprocal murder. The Indians perceived in this protection only what was beneficial to themselves — an engagement to punish aggressions on them. It involved, practically, no claim to their lands, no dominion over their persons. It merely bound the nation to the British Crown, as *302 a dependent ally, claiming the protection of a powerful friend and neighbor, and receiving the advantages of that protection without involving a surrender of their national character.
“ This is the true meaning of the stipulation and is undoubtedly the sense in which it was made. Neither the British Government nor the Cherokees ever understood it otherwise.
“ The same stipulation entered into with the United States is undoubtedly to be construed in the same manner. They receive the Cherokee Nation into their favor and protection. The Cherokees acknowledge themselves to be under the protection of the United States and of no other power. Protection does not imply the destruction of the protected.”
The stipulation that the plaintiff tribe acknowledged itself to be under the United States and no other nation in no way divested the plaintiff tribe of its sovereign power to enter into treaties with the United States on equal terms or lessened its obligations under such treaties when made. The purpose and effect of the treaty were to place the contracting parties upon the same footing in every respect upon which they stood before the war with Great Britain. No contention is made that the relationship of guardian and ward existed between them before the war. Certainly this relationship could not be created by a treaty that merely reestablished their preexisting political relations. The contention that this was the effect of article 3 of the treaty is without merit.
The court cannot inquire into the adequacy of the consideration for the cession made under article 1 of the treaty of 1825. It may, as the plaintiff contends, have been wholly inadequate, but the court must accept the treaty as it was written by the parties and can neither alter nor amend any of its provisions. Sisseton and Wahpeton Indians v. United States, 58 C. Cls. 302; Creek Nation v. United States, 63 C. Cls. 210. A treaty may be modified or abrogated by an act of Congress, but the power to make and unmake is essentially political and not judicial. United States v. Old Settlers, 148 U. S. 427; Osage Tribe of Indians v. United States, 66 C. Cls. 64.
*303 The plaintiff is not entitled to recover on this item of the claim.
2. Claim for failure to provide blacksmith. Article 4 of the treaty of 1825 provided:
“ The United States, immediately upon the ratification of this convention, or as soon thereafter as may be * * * shall employ such persons to aid and instruct them in their agriculture, as the President of the United States may deem expedient; and shall provide and support a blacksmith for them.”
The United States provided a blacksmith for the plaintiff under the provisions of this article practically all the time for the period September 1, 1826, to June 30, 1846, except the period from September 30, 1844, to February 15, 1846, when no blacksmith was furnished, at a total cost of $11,-507.94. This amount was charged to the fulfillment of the treaty of 1825.
Article 7 of the treaty of April 30, 1846, provided:
“ Should the Government of the United States be of opinion that the Kansas Indians are not entitled to a smith under the 4th article of the treaty of June 3, 1825, it is agreed that a smith shall be supported out of the one thousand dollars provided in the 4th [second] article for agricultural purposes.”
Subsequent to the ratification of this treaty payments for blacksmiths were made out of appropriations made to fulfill the stipulations of the 1846 treaty to the extent of $9,018.85, out of gratuity appropriations to the extent of $5,672.88, and out of reimbursable appropriations to the extent of $2,509.01, the latter amount being subsequently repaid to the United States out of funds of the plaintiff arising from the sales of its lands under the treaty of October 5,1859. Except during short intervals, a blacksmith and an assistant blacksmith were provided for the plaintiff tribe during the period from July 1,1846, to June 30,1888. Since the latter date no blacksmith has been furnished.
The plaintiff contends that article 4 of the treaty of 1825 obligated the United States to supply it with a blacksmith continuously from the date of the ratification of the treaty to the date of the filing of its petition herein, as a part of *304 the consideration for the lands ceded in the treaty. It is contended that the reasonable value to the plaintiff of such blacksmith was $1,000 per year, and claim is made for $52,-030.93 for the period in which the United States failed to supply a blacksmith without expense to plaintiff in accordance with its obligations under the treaty of 1825. Claim is also made for the $9,018.85 expended by the Government for a blacksmith out of appropriations made under the treaty of 1846, and for the $2,509.01 expended for that purpose out of reimbursable appropriations later repaid out of plaintiff’s funds, making a total claim for $63,558.79.
In respect to the contention that the obligation of the United States, to supply the plaintiff tribe with a blacksmith under the treaty of 1825, was a continuing one without limitation of time, it is only necessary to point out that the provisions of a treaty between the United States and a nation or tribe of Indians may be modified or abrogated at any time by a subsequent treaty or by an act of Congress. Section 7 of the treaty of 1846 clearly modified the provisions of section 4 of the treaty of 1825 in respect to the employment of a blacksmith. Thereafter the blacksmith was to be supported “ out of the one thousand dollars provided in the fourth [second] article for agricultural purposes ”, should the Government of the United States be of the opinion plaintiff was not entitled to a smith under the fourth article of the treaty of 1825. The fact that no appropriation for the support of a blacksmith was made by Congress under the treaty of 1825, after the ratification of the. treaty of 1846, shows that the Government was of the opinion that the plaintiff tribe was no longer entitled to a smith under article 4 of that treaty. The obligations of the United States, under the treaty of 1825, to provide at its own expense a blacksmith for the plaintiff terminated upon the ratification of the treaty of 1846, and the claim, insofar as it relates to the period thereafter, cannot be maintained. The plaintiff is entitled to recover for the value of the services of a blacksmith during the period in which a smith was not provided, September 30,1844, to February 15,1846, the sum of $1,000.00.
3. This claim, like the one just considered, arises and grows out of article 4 of the treaty of 1825: “ The United States *305 * * * shall employ such persons to aid and instruct them in their agriculture, as the President of the United States may deem expedient.” Under the stipulations of this article the United States expended in “ pay for farmers ” for the plaintiff during the period commencing in the year 1827 and ending with the fiscal year 1846, the sum of $7,152.61. The amount of the payments is not in dispute and no claim is made that any additional amount is due for this period. The claim covers the period subsequent to the date of the treaty of 1846. By article 1 of this treaty the plaintiff ceded to the United States 2,000,000 acres of land. By article 2 it was provided that $200,000 of the consideration for the cession should be funded at five percent, the interest of which should be paid to plaintiff annually. It was provided that one thousand dollars of the interest so accruing should be applied annually “ for agricultural assistance, implements, etc.; but should the Kansas Indians at any time be so far advanced in agriculture as to render the expenditure for agricultural assistance unnecessary, then the one thousand dollars above provided for that purpose shall be paid them in money with the balance of their annuity.”
Following the ratification of the treaty of 1846 the United States, up to and including the year 1882, expended out of moneys appropriated in fulfillment of the treaty, the sum of $8,079.98 for “ pay for farmers.” During the same period it expended for the same purpose the sum of $1,269.22 out of reimbursable appropriations, which amount was subsequently repaid out of funds belonging to plaintiff, and the further sum of $9,234.12 out of gratuity appropriations. The claim is for the refund of the amount expended for “ pay for farmers ” out of appropriations made to fulfill the stipulations of the treaty of 1846, and the amount paid out of reimbursable appropriations subsequently repaid, amounting in all to $9,749.20, on the ground that the Government was obligated to make such expenditures in behalf of the plaintiff under' article 4 of the treaty of 1825. This claim is without merit. The provisions of article 2 of the treaty of 1846 so clearly abrogated and superseded the provisions of article 4 of the treaty of 1825 that further discussion of the matter is unnec *306 essary. The plaintiff is not entitled to recover on this item of the claim.
4. This claim grows out of article 5 of the treaty of 1825, which provided that “ thirty-six sections of good lands, on the Big Blue River, shall be laid out under the direction of the President of the United States, and be sold for the purposes of raising a fund, to be applied, under the direction of the President, to the support of schools for education of the Kanzas children, within the Nation.” Pursuant to this provision, lands measuring 22,545.94 acres were laid out and offered to the public for sale. In September 1837 sales were discontinued, only 14,629.19 acres of the land having been sold. There is no evidence as to what became of the remaining 7,916.75 acres, but that they were not disposed of for the benefit of the plaintiff is admitted. The amount received by the Government for the lands sold was $17,894.87, an average of $1.22 per acre. This amount under the provisions of the act of January 9,1837, was invested in interest-bearing State bonds. These bonds from time to time were exchanged for other interest-bearing bonds, and the interest accruing on such bonds was also from time to time applied in the purchase of other bonds until the passage of the act of April 1, 1880, at which time the par value of the bonds was $27,174.41. The bonds were then disposed of at par, and the amount received was deposited in the United States Treasury, in lieu of investment, to the credit of the plaintiff, under the heading “ Kansas school fund ”, upon which interest was paid at the rate of 5 percent per annum. This fund was subsequently, under the act of July 1,1902, consolidated with other funds of the tribe and, with the exception of $1,972.48, which remained in the fund as of June 30,1928, was disbursed for the benefit of the plaintiff.
Of the income produced from the foregoing fund, $54,-276.44 was expended up to 1903 for the education of Kansas Indian children in accordance with treaty stipulations, and $1,217.50 was transferred to the Kansas consolidated fund in 1903. The sum of $26,027.71 was expended for the benefit of the plaintiff but for noneducational purposes.
The plaintiff contends that upon these facts it is entitled to recover the sum of $297,906.70, calculated in this manner: *307 The lands set apart for school purposes had a value of $2.00 per acre in 1827 and should have been disposed of by the Government at that price, or $45,091.88. Interest on this amount at 5 percent from 1827 to the creation of the Kansas consolidated fund in 1903 would be $157,821.50. Deducting from this sum $55,493.94, which plaintiff admits has been properly accounted for, leaves $102,327.64 as the proper interest balance to be transferred to the Kansas consolidated fund in 1903. In addition to this amount there would have been $27,197.01 more in the principal fund had the lands been disposed of at $2.00 per acre, making a total of $129,-524.65 additional funds that should have been available for transfer to the Kansas consolidated fund in 1903, had the Government disposed of the lands in accordance with treaty stipulations. Interest on this sum at the rate of 5 percent from 1903 to the date of the filing of the petition would make the total amount claimed $297,906.70.
There is no evidence in the record to support the contention that the thirty-six sections of land involved were worth $2.00 per acre in 1827. There is no evidence whatever as to the value of the land, and the fact that the Government in twelve years was able to dispose of only 14,629.19 acres of the 22,545.94 acres laid out and offered for sale, and that at an average price of only $1.22 per acre, strongly negatives the contention that their minimum value was $2.00 per acre. Furthermore, there is nothing in the record to justify the conclusion that the 14,629.19 acres sold were not disposed of by the Government in accordance with the terms of the treaty and at the best available prices. The claim, therefore, that the plaintiff is entitled to an accounting of the amount due under article 5 of the treaty of 1825, on the basis of a principal fund of $45,091.88, must fall.
The plaintiff is entitled to recover the value of 7,916.75 acres which were not disposed of for the benefit of the tribe. While there is no evidence as to the value of these lands, we think recovery should be on the basis of $1.22 per acre, the average price received for the lands which were sold, or a sum of $9,658.44, with interest. Had these lands been disposed of in accordance with the stipulations of article 5 *308 of the treaty, this additional amount would have been available for investment in interest-bearing securities under the act of January 9, 1837, supra, and with the accumulated interest thereon would have been available for transfer to the Kansas Consolidated Fund in 1903. The additional amount thus available for transfer to the Kansas Consolidated Fund would have been $41,521.29. Allowing interest on this amount at 5 percent, as provided in the act of July 1, 1902, supra, from 1903 to the date of the petition in 1929, would make the total amount plaintiff is entitled to recover $101,751.31.
Expenditures amounting to $26,027.71 for noneducational purposes were improperly charged against the income arising from the principal fund. They were made, however, for the benefit of the tribe; and since the United States was under no treaty or other legal obligation to make such expenditures, they were gratuities to the tribe, and under section 3 of the jurisdictional act become offsets and balance the claim for the $26,027.71 unlawfully charged against the income from the educational fund.
5. This claim is based on the contention that the plaintiff tribe, in addition to the lands described and ceded by article 1 of the treaty of 1825, occupied and had title to and claimed lands in Missouri, Iowa, Nebraska, Kansas, Colorado, Oklahoma, and Texas, embracing more than 10,000,000 acres which the United States has illegally and unjustly taken possession of and sold, or otherwise disposed of. The claim is for the value of the additional lands claimed.
The words of the cession in article 1 of the treaty are: u The Kansas do hereby cede to the United States all the lands lying within the State of Missouri, to which the said nation have title or claim; and do further cede and relinquish, to the said United States, all other lands which they now occupy, or to which they have title or claim, lying west of the said State of Missouri, and within the following boundaries.” Then follows the description by metes and bounds of the lands ceded. We think these boundaries not only embraced the lands ceded to the United States by the plaintiff, but that they are also descriptive of all other lands *309 lying west of the State of Missouri to which the plaintiff laid claim or had title. The plain intent and purpose of article 1 of the treaty was the extinguishment of the plaintiff’s title to all lands then occupied or claimed by it, and that was the legal effect of the article. This was in pursuance of the then well-established policy of the Government to extinguish tribal Indian claims to indefinite tracts of land and to provide for them certain and defined reservations. This latter purpose was accomplished by article 2 of the treaty which created a reservation for the use of the plaintiff out of the lands ceded, and defined such reservation by metes and bounds. The effect, therefore, of articles 1 and 2 of the treaty of 1825 was to extinguish plaintiff’s title or claim to all lands, both in the State of Missouri and west of that State, except the retained reservation.
The plaintiff contends that the United States recognized plaintiff’s title to unceded lands in southwestern Kansas in the treaty of August 16, 1825, in which the United States, for a consideration of $800.00, obtained the right to survey and mark out a road “ through any of the territory owned or claimed by said Kansas Tribe or Nation of Indians.” This treaty, together with a similar one with the Osage Tribe of Indians, for a like consideration, made on August 10, 1825, was entered into pursuant to an act of Congress of March 3, 1825 (4 Stat. 100), which authorized the President to appoint commissioners “ to mark a road from the western frontier of the State of Missouri to the boundary line of the United States, in the direction of Santa Fe, of New Mexico ”, provided that the consent, by treaty, of the intervening tribes could be obtained. This act was passed some months before the treaty of June 3, 1825, was entered into, and at a time when the plaintiff tribe claimed a right and title in, and to, a large portion of the land over which the proposed road would run. The treaty of August 16, 1825, granting the United States the right to survey and mark out the road was made some months before the treaty of June 3, 1825, was ratified and confirmed. The same situation existed in reference to the Osage treaty of June 2, 1825, in which that tribe had ceded to the United States all lands to which it had title or claim “ lying within the State of Missouri and Territory *310 of Arkansas, and to all lands lying west of the said State of Missouri and Territory of Arkansas, north and west of the Ked Eiver, south of the Kansas Eiver, and east of a line to be drawn from the head sources of the Kansas, south-wardly through the Eock Saline ”, except a certain defined reservation. The road was subsequently marked as far as the Arkansas Eiver, but its exact location is not determinable from the record. There is no doubt, however, that as far as it was marked the road traversed lands ceded to the United States by the Osage Tribe and the plaintiff tribe in their respective treaties of June 2 and June 3,1825. In these circumstances the treaty of August 16, 1825, cannot be held to be a recognition by the United States of the plaintiff’s title to, or claim in, any lands other than those ceded in the treaty of June 3, 1825.
The defendant challenges the jurisdiction of the court to hear and adjudicate this claim on the ground that it does not arise or grow out of any treaty or agreement between the United States and the Kansas Tribe of Indians, or any act of Congress in relation to Indian affairs. Since the plaintiff is not entitled to recover on the merits of the claim, consideration of this contention becomes unnecessary and we prefer not to unduly lengthen the opinion with a discussion of the point raised. The plaintiff cannot recover on this item of the claim.
6. Ey article 1 of the treaty of January 14,1846, the plaintiff tribe ceded to the United States 2,000,000 acres on the east end of the reservation retained by it in the treaty of June 3,1825, for a consideration of $202,000. It is contended that this was an inadequate consideration for the lands ceded, and that the United States, as guardian of the plaintiff tribe, is obligated to pay as a minimum the fair value of the lands, which the petition asserts was $1'.25 per acre. The claim is for the difference between the alleged fair value of the lands and the amount paid for them under the stipulations of the treaty.
This claim is similar in every respect to claim no. 1, in which additional compensation was claimed for lands ceded by treaty of June 3, 1825. What was said in the consid *311 eration of that claim is fully applicable to this claim and need not be repeated. The plaintiff is not entitled to recover as to this item.
7. This claim also arises and grows out of the treaty of January 14, 1846. The claim is for the value of the lands conditionally ceded to the United States in article 5 of the treaty. The claim has long been known to the plaintiff tribe as the “ surplus land claim.” The pertinent provisions of the-treaty are:
“Article 3. In order that the Kansas Indians may know the west line of the land which they have ceded by this-treaty, it is agreed that the United States shall, as soon as may be convenient in the present year, cause the said line to-be ascertained and marked by competent surveyors.
“Article 4. The Kansas Indians are to move from the land ceded to the United States, by the first article of this treaty, by the 1st day of May 1847.
“Article 6. As doubts exist whether there is a sufficiency of timber on the land remaining to the Kansas, after taking off the land ceded in the first article of the treaty, it is agreed by the contracting parties that after the western line-of the said cession shall be ascertained, the President of the United States shall be satisfied that there is not a sufficiency of timber, he shall cause to be selected and laid off for the Kansas a suitable country, near the western boundary of the-land ceded by this treaty, which shall remain for their use-forever. In consideration of which the Kansas Nation cede to the United States the balance of the reservation under the treaty of June 3d, 1825, and not ceded in the first article-of this treaty.”
Immediately following the ratification of the treaty steps were taken to survey the west line of the lands ceded, as provided in article 3. The plat and field notes of the original survey of the Kansas lands could not, however, be located and the matter of ascertaining the western line of the cession went over until the following year, 1847. Early in the year 1847 the Commissioner of Indian Affairs determined to inquire into the matter of the sufficiency of timber on the lands remaining to the plaintiff tribe after taking off the 2,000,000 acres ceded in the first article of the treaty without waiting' for the definite ascertainment of the west line of the cession. The Superintendent of Indian Affairs at St. Louis was in-- *312 structed to send a small exploring party to a point near about where the line would run to ascertain with certainty whether there was a sufficiency of timber west of the line for the plaintiff tribe. The exploration was made by an Indian agent, in company with six Kansas Indians, three of whom were chiefs. While the agent did not explore the entire tract because of the presence of hostile Indians in the vicinity he went as far west of the Grand Point (located just above the junction of the Republican and Smoky Hill Rivers) as he thought safe. He was informed by the members of the plaintiff tribe, who were with him and who were thoroughly familiar with the country west of the Grand Point, that there was no timber west of the Point except cottonwood and some very short scattering timber of other kinds, and that they could not live on the Kansas River or its waters anywhere west of the Grand Point. The agent having “ become perfectly satisfied ” that there was not a sufficiency of timber on the lands remaining to the plaintiff, after taking off the lands ceded in article 1 of the treaty, proceeded under the instructions received by him to examine the country for a suitable location for the plaintiff tribe, as was provided in article 5 of the treaty. He finally determined that a tract of land 20 miles square at the headwaters of the Neosho River in the Council Grove country was “ a beautiful and good country ”, with a “ sufficient quantity of good timber to answer the Kansas Indians for all agricultural purposes ”, and recommended it as a suitable location for the future home of the plaintiff tribe. The Superintendent of Indian Affairs approved the selection and recommended its approval by higher authority. Upon the recommendation of the Secretary of War the President approved the selection, and the plaintiff Indians thereafter removed to it and occupied it as their home until the year 1873, when they were removed to a reservation in Indian Territory.
The Council Grove Reservation comprised 255,854.49 acres. The claim is for the difference between the value of the lands conditionally ceded in article 5 of the treaty, approximately 4,000,000 acres, and the value of the Council Grove Reservation. The claim is based on the contention that the cession *313 never became operative because the following conditions precedent to the cession were not met by the United States: (1) The western line of the cession made by article 1 of the treaty was not ascertained as was required by article 3. (2) No proper investigation was made to determine the sufficiency of timber, and no finding made by the President. (3) As a matter of fact there was ample timber. (4) The reservation at Council Grove was not near the western boundary of the lands ceded by the treaty. (5) The Council Grove Reservation was not a “ suitable country ” as specified in the treaty.
While the west line of the lands ceded in article 1 of the treaty was not definitely ascertained before the Council Grove Reservation was confirmed by the President, the material provisions of article 5 of the treaty that the “ President of the United States shall be satisfied that there is not a sufficiency of timber ”, and that “ he shall cause to be selected and laid off for the Kansas a suitable country, near the western boundary of the land ceded ” were substantially, if not literally, met. The approval by the President of the report of the Indian agent, who made an exploration of the lands not ceded in article 1 of the treaty, that there was not a sufficiency of timber on the lands, conclusively establishes the fact that the President was “ satisfied ” that there was not a sufficiency of timber. That ended the matter, and the court cannot go behind his action and inquire as to whether in fact there was, or was not, a sufficiency of timber for the use, of the plaintiff on the unceded lands. If the President was satisfied that there was an insufficiency of timber, the requirement of article S of the treaty as to that question was fully complied with. The same rule applies to the question as to whether or not the Council Grove Reservation was a “suitable country”, within the requirements of article 5. The Indian agent who selected the Council Grove country reported that it was a “ beautiful ” and “ a good country ” and a “ suitable location ” for the future home of the plaintiff. The report was approved by the President, who, under the treaty, was to determine the suitability of the lieu reservation. This action by the President is conclusive as to the question of the suitability of the Council Grove Reservation, and is not subject to review by the court.
*314 The definite ascertainment of the western line of the lands ceded in article 1 of the treaty became entirely unnecessary upon the President becoming satisfied that there was an insufficiency of timber on the remaining lands. That such line was not established before the President satisfied himself of that fact in no way operated to the disadvantage of" the plaintiff, and was not a material failure to meet a condition precedent to the cession.
The President having satisfied himself of the insufficiency of timber on the lands not ceded in article 1 of the treaty,, and having caused to be selected and laid off a suitable country for the use of the plaintiff, as a lieu reservation, the conditions precedent to the cession of the land involved were complied with, and the conditional cession provided in article 5 of the treaty became effective. It follows that the plaintiff is not entitled to recover on this item of the claim.
8. This claim arises under the treaty of October 5,1859, as amended and ratified June 27, 1860 (12 Stat. 1111); the' treaty of March 13, 1862, as amended and ratified February 6, 1863 (12 Stat. 1221); and certain acts of Congress hereinafter referred to.
The material provisions of the treaty of 1859 briefly stated are: (1) The tribe was to retain a certain part of the Council Grove Reservation, to be assigned in severalty to members; of the tribe in stated quantities, the balance of the reservation to be sold after public advertisement, in parcels not exceeding 160 acres each, to the highest bidder for cash, these sales to be upon sealed proposals. (2) The surplus-lands remaining after assignment of lands in severalty to members of the tribe to be sold in the same manner. (3) The payment out of the proceeds of sale the fair value of improvements made by settlers who, in good faith, had settled upon the land prior to December 2, 1856 (that being the day the survey of the Council Grove Reservation was certified by the agent of the tribe). (4) Payment of the valid debts of the plaintiff out of the funds arising from the sales of the surplus lands.
The treaty of March 13, 1862, as amended, provided for the issuance of certificates of indebtedness to settlers who- *315 had settled on the diminished reserve between December 2, 1856, and October 5, 1859, for the value of their improvements, in a sum not in excess of $15,000, and for the issuance of similar certificates of indebtedness for the value of their ■improvements, not exceeding $14,421, to settlers who had : settled on the diminished reserve prior to December 2, 1856. The treaty also provided for the issuance of certificates of 'indebtedness to owners of approved claims against the tribe, in an amount not exceeding $36,394.41, the certificates of indebtedness to be receivable at par in payment for lands of 'the tribe sold under the treaty of October 5,1859.
Sales of land under the treaty of 1859 commenced in 1864. TJp to the passage of the act of May 8, 1812, only 37,906.76 .•acres had been sold. This act provided in part for the . appraisal of the unsold lands and for their sale at appraised value to settlers for cash, for a period of one year after the ■date of the act, and for the sale thereafter of the remaining lands to the highest cash bidder, no lands to be sold for less than their appraised value. The act further provided for the removal of the tribe to Indian Territory, with their consent, which was given on June 24, 1872, and for the sale of the diminished reserve in the same manner as the other lands. The unsold lands, including the diminished reservation, were ■thereupon appraised as provided in the act, and their value was fixed at $689,264.11. The lands were then advertised for sale under sealed bids, but because of the high appraisals ■and the cash terms of sale only 1,838.72 acres were sold. 'The act of June 23, 1874 (18 Stat. 272), reciting in the preamble that “ the appraisement thus made was so high that neither settlers nor purchasers were able to pay the same ”, .-amended the act of June 24, 1872, by permitting settlers to ;make payments in six annual installments, and by permitting entrymen to make payment of one-fourth the appraised value upon entry and the balance in three equal annual installments. The Government not being able to dispose of the lands under the provisions of this act, Congress again liberalized the terms under which the lands should be sold in the •act of July 5, 1876 (19 Stat. 74). This act, also reciting in •the preamble that the appraisements under the act of 1872 *316 were so high that neither settlers nor purchasers were able to pay them, provided that settlers could make payments in six annual installments and that entrymen could make payment of one-sixth upon entry and the balance in five annual installments. The act also provided for a new appraisal of the lands if the Secretary of the Interior was satisfied that they had been appraised at more than their present cash value. After making certain provisions for the net proceeds arising from sales of the lands, the act provided “ that no proceedings shall be taken under this act until the said Kansas Indians shall file their assent thereto with the Secretary of the Interior.” The plaintiff tribe assented to the provisions of the act on May 31, 1877, with the condition that the appraisers should be appointed in a certain way-This condition was accepted by the Secretary of the Interior. Appraisers were thereupon appointed and a new appraisal of the lands was made. Certain modifications in the manner of making payments for the lands sold were subsequently made in the act of March 16, 1880 (21 Stat. 68).
Under the provisions of the foregoing treaties and acts of Congress, all the Council Grove Reservation, consisting of 175,444.89 acres of trust lands and 80,409.60 acres in the diminished reserve lands, was sold and disposed of at a sum of $326,836.82 less than the original appraised value of the lands under the act of 1872.
The Secretary of the Interior, pursuant to the provisions-of the treaty of 1862, as amended, issued to settlers for improvements made by them on the lands certificates of indebtedness in the sum of $27,691.82. These certificates were-known as “ class 2 scrip.” He also issued certificates of indebtedness to holders of approved claims against the tribe-in the sum of $39,832.56, which sum is $3,438.09 in excess of the amount authorized in the treaty. He also, in 1862, before the treaty of that year authorizing the issuance of the aforesaid certificates of indebtedness was entered into, issued certificates of indebtedness to one Robert S. Stevens in the sum of $87,133.45 in payment of improvements made by him on the diminished reserve, under contract with the United States. These certificates were known as “ class 1 scrip ” *317 and were not receivable in payment for lands sold. The three classes of scrip bore interest at the rate of 6 percent, although the treaty of 1'862 was silent as to interest on the two classes of scrip authorized thereunder, to wit, certificates of indebtedness for improvements made by settlers on the-land and certificates of indebtedness to holders of approved claims against the tribe. However, the act of August 5,1882. (22 Stat. 257), authorized the payment of both principal, and interest of so much of the Stevens scrip as was then in the possession of persons (mechanics and others) who actually performed the labor in the construction of the buildings and other improvements erected under the Stevens contract and who received such certificates in lieu of cash in. payment therefor, and the act of March 3, 1885 (23 Stat. 362), likewise made provision for the payment of both principal and interest of certificates of indebtedness issued in the years 1862 and 1864, known as “ Kaw or Kansas scrip.” Also,, the act of June 29, 1885, made provision for payment of the-balance of the principal and interest of the Kaw or Kansas scrip, pursuant to the provisions of the foregoing act of March 3, 1885.
Class 2 scrip to the amount of $26,205.46 with accrued interest to the amount of $1,345.05 was received in payment of sales of lands, and the amount of $703.95 with accrued interest amounting to $847.71 was redeemed in cash out of funds belonging to plaintiff. Class 3 scrip to the amount of $23,691.57, with interest thereon amounting to $2,822.99, was received in payments for lands sold, and $15,832.16 with $19,831.47 interest thereon was redeemed in cash. Of the Stevens, or class 1 scrip, $84,533.45 with interest thereon in the sum of $105,335.42 was redeemed in cash out of funds of. the plaintiff. The total redemption in cash of the three classes of scrip was $101,069.58 on principal and $126,014.60 in interest.
Upon the facts stated the plaintiff claims: (a) The difference between the appraisal value of the lands under the act of 1872 and the amount received from their sales, $326,836.82; (5) interest at 5 percent on one-half the appraised value of' the diminished reserve lands, exclusive of improvements, from 1872, $437,859.34; (c) the difference between the actual *318 value of the Stevens’ improvement and the amount paid for the same, $83,378.60; (d) the amount paid for class 3 scrip issued in excess of the amount authorized in the treaty, $3,-438.09; (e) the amount paid on class 2 scrip for improvements of settlers on the lands, $26,909.43, making the total amount claimed $878,113.35.
(ai) and (5). The act of May 8, 1872, imposed no obligation on the United States to sell the lands involved at their appraised value. The only obligation on the part of the Government in this respect was not to sell any of the lands at less than their appraised value, and it is not contended that the Government sold any lands under the provisions of this statute at less than their appraised value. The lands were reappraised under the act of July 5, 1876, to the provisions of which the plaintiff gave formal assent. No claim is made that any of the remaining lands sold under the provisions of this act were sold at less than their value under the new appraisal. These acts amended and superseded the provisions of the treaty of 1859 that the lands should be sold in tracts not exceeding 160 acres, to the highest bidder for cash, upon sealed proposals duly invited by public advertisement. It thus appears that the lands were all sold in conformity with the provisions of the treaty of 1859, or the statutes in effect at the time of the various sales. This being true, the plaintiff tribe has no legal or equitable claim against the United States for the difference between the appraised value of the lands under the act of 1872 and the amount received for them when sold, $326,836.82, or any part thereof. Likewise the plaintiff has no legal or equitable claim against the United States for interest at 5 percent on one-half the appraised value of the diminished reserve lands from 1872. This claim presupposes a legal obligation on the part of the United States to make an immediate appraisal of the lands and to dispose of them promptly at the appraised value. There is no proof that the appraisal of the lands was not made at the earliest possible time after the assent of the tribe to the act of 1872 was procured, and, as we have seen, the act did not obligate the United States to dispose of the lands of the diminished reserve at their appraised value. *319 Furthermore, it is clearly established that it was not possible to sell the bulk of these lands until after their reappraisal under the act of 1876.
Items (c), (d), and (e) grow out of the issuance and redemption of the certificates of indebtedness heretofore referred to. All transactions relating to the issuance and redemption of these certificates were investigated, considered, and adjudicated by the Kaw commission. This commission was appointed pursuant to the act of July 1, 1902 (32 Stat. 636), for the investigation, consideration, and settlement of “ all claims, of whatever nature which said Kansas or Kaw Tribe may have or claim to have against the United States ”, and for the payment of the amount found due by the commission. The plaintiff in the presentation of its claims before the commission “ did not specifically apply for any moneys other than those growing out of the various certificates of indebtedness or scrip transactions”, although in a general way claim was made for all other moneys justly due the tribe in the adjustment of the accounts between it and the United States. The commission made a comprehensive report in which every phase of the transactions relating to the issuance and redemption of the various classes of scrip, including interest thereon, was reviewed, and made an award to the plaintiff tribe of a specific amount found to be due on account of such transactions. The amount of the award was appropriated by the act of March 3, 1905 (33 Stat. 1048, 1079), with the condition that no part of it should be paid “ until said Indians, in general council, lawfully convened for that purpose, shall execute and deliver to the United States a general release of all claims and demands of every name and nature against the United States.” The release was duly executed at a general council of the tribe held for that purpose, and the amount of the .commission’s award was credited to the Kansas consolidated fund.
The plaintiff contends that with respect to the three items now under consideration, as well as the other items comprising claim no. 8, the award made by the Kaw commission and the settlement made in accordance therewith, only partially compensated the tribe for moneys due it under the treaty of *320 1859. However this may be, the acceptance of the award by the plaintiff, and the execution by it of a release of all claims and demands of every name and nature against the United States, constitute, we think, a complete defense against any claim for additional compensation growing out of any of the transactions specifically considered by the commission and which formed the basis of its award. This defense is not waived by any provision of the jurisdictional act and cannot be waived by the court. The rule'is well settled that a ■valid release conclusively estops the parties from reviewing and litigating the claim released. It is not contended that .the release in question was invalid. It was executed in consideration of payment of the award of the commission, which at that time was satisfactory to the tribe. The act creating the commission provided that “if the settlement of the claims of said tribe or the accounting is not satisfactory to said tribe * * * then the said tribe of Indians shall have two years from the date of the report and accounting in which to enter suit in the Court of Claims, with the right of appeal to the •Supreme Court of the United States, by either party, for the amount due or claimed to be due said tribe * * *. And jurisdiction is hereby conferred upon the United States Court of Claims to hear and determine all claims of said tribe ■against the United States and to enter judgment thereon.” The plaintiff was satisfied with the settlement of its claims by the commission and did not avail itself of the right to have them considered by this court and the Supreme Court.
Having accepted payment of the award, and having in consideration thereof released the United States from all ■claims of every kind and nature, the plaintiff is estopped from now litigating any of the claims on which the award of the •commission was based. Items (c), (d), and (e) of the claim under consideration, as we have seen, grow out of the various scrip transactions, all of which were exhaustively examined by the commission, and, in the main, formed the basis on which the award was made. The plaintiff, therefore, is not entitled to recover on these items and is not entitled to recover >on any of the items of claim no. 8.
9. The acts of Congress, and the facts under which this claim is made, are set out in detail in the findings. The claim *321 is based on tbe contention that under the act of June 5,1872 (17 Stat. 228), and the deed from the Cherokee Tribe to the United States for 1,570,196.3 acres of land in Indian Territory, now Oklahoma, for the use and benefit of the Osage and Kansas Indians, the plaintiff tribe became entitled to an undivided pro rata interest in the entire reservation, including the value of the lands included in the reservation, and the Revenues arising and accruing from oil and mineral deposits, also from grazing leases, the, sale of town sites, etc. The amount claimed in the petition is $40,863,825.79, which in the plaintiff’s suggested findings of fact is reduced to $26,368,763.61.
A reservation in Indian Territory for the use of the ■Great and Little Osage Indians was provided in the act of -July 15, 1870 (1'6 Stat. 335). It was provided that whenever these Indians agreed thereto they should be removed from the State of Kansas to land in Indian Territory, to •consist of a tract of land in compact form equal in quantity to 160 acres for each member of the tribe, the lands to be paid for out of the proceeds of the sales of their Kansas lands. The Osages selected a tract of land in the Indian Territory of approximately 560,000 acres within that part of the territory of the Cherokees lying to the west of the '96th meridian, upon which the United States in a treaty with that tribe of July 19, 1866 (14 Stat. 799), was given the right to settle friendly Indians. The selection was approved. Subsequently it was discovered that part of the land selected lay east of the 96th meridian. On January 5, 1872, an agreement was entered into between the United States and the Osage Tribes under which the Indians agreed to accept in lieu of the lands formerly selected by them which lay east of the 96th meridian the lands selected by them which lay west of that meridian, and certain other .additional lands. This agreement contained the provision .that — ~
“ The Kansas or Kaw tribe of Indians, now in the State ■of Kansas, shall have the right to settle on the tract of land above described, and ceded to the Osage tribe of Indians; -and in case the Osage and Kansas tribes of Indians cannot agree upon their respective locations or upon the price to be *322 paid for the lands ceded to the Kansas Indians, the President of the United States shall determine these matters for them.”
By the act of June 5,1872, the selection of the lieu reservation by the Osages was confirmed and its boundaries were-described by metes and bounds. The act contained the following provision:
“ That said Great and Little Osage Tribe of Indians shall permit the settlement within the limits of said tract of land (of) the Kansas Tribe of Indians, the lands so settled and occupied by said Kansas Indians, not exceeding one hundred' and sixty acres for each member of said tribe, to be paid for by said Kansas Tribe of Indians out of the proceeds of the-sales of their lands in Kansas, at a price not exceeding that paid by the Great and Little Osage Indians to the Cherokee Nation of Indians.”
Following the passage of the foregoing act, a tract of' land in, the northwestern corner of the Osage Reservation,, consisting of about 102,400 acres, was selected for the plaintiff tribe, to which the entire tribe removed in June 1873. In 1873 Osage moneys were transferred to the credit of the Cherokees in payment for the entire reservation, including-the tract selected by plaintiff. In 1'881, upon a settlement between the United States and the Osages, that tribe was credited with the sum of $70,096.12 on account of the lands in its reservation secured to the plaintiff, which amount was subsequently reimbursed to the United States out of funds-to the credit of the plaintiff tribe arising from the sale of its Kansas lands, the result being that the plaintiff tribe paid for the lands selected and occupied by it, and the Osages-paid for the lands occupied by them.
The Cherokee Tribe, on June 14, 1883, conveyed to the United States, in trust for the use and benefit of the Osage- and Kansas Indians, all the lands contained in the lieu reservation confirmed to the Osages in the act of June 5, 1872,, amounting to 1,570,196.3 acres. In the deed reference was made to the provision in the treaty of July 19, 1866, giving-the United States the right to settle friendly Indians on certain Cherokee lands, to the act of June 5, 1872, setting-apart the lands conveyed to the Great and Little Osage In *323 dians, with the proviso that they should permit the settlement of the Kansas Tribe within the limits of the tract, and to the act of March 3, 1873, under the provisions of which the C'herokees had been paid for the lands. The lands conveyed were described as embracing certain enumerated townships and fractional townships, as shown by an annexed plat, with the recitation that certain enumerated townships and fractional townships of the lands so conveyed, containing an area of 100,137.32 acres, had beet set .apart for the Kansas Indians, and paid for by them.
The agreement between the United States and the Osages •on January 5, 1'872, undoubtedly contemplated that a certain and definite part of the lands of the Osage lieu reservation should be set apart for the plaintiff tribe. The language of the agreement that “ in case the Osages and Kansas Tribes of Indians cannot agree upon their respective locations, or upon the price to be paid for the lands ceded to the Kansas Indians, the President of the United States shall determine these matters for them ” is susceptible of no other reasonable construction. Likewise, the act of June 5, 1872, clearly contemplated the purchase by the plaintiff tribe of a -certain and definite part of the Osage Keservation. The language “ the lands so settled and occupied by said Kansas Indians, not exceeding one hundred and sixty acres for each member of said tribe, to be paid for by said Kansas Tribe '* * * at a price not exceeding that paid by the Great and Little Osage Indians to the Cherokee Nation of Indians” ■completely negatives the contention that the plaintiff purchased and became entitled to an undivided pro rata interest in the entire reservation. Neither is there any provision in the Cherokee deed of conveyance of June 14, 1883, that supports this contention. While all the lands involved were conveyed to the United States in trust for the use and benefit of the Osage and Kansas Indians, it is recited in the deed that a certain and definite part of the lands so conveyed, consisting of 100,137.32 acres, had been set apart to the plaintiff tribe and had been paid for by it. Clearly plaintiff’s interest in the lands conveyed was limited to the 100,137.32 acres described in the deed, and shown on the an *324 nexed plat, as having been set apart for its use and benefit. These were the lands, then and afterwards, occupied by the plaintiff and were the precise lands paid for out of its funds.. The remaining part of the lands conveyed was then occupied by the Osage Tribes, and had been paid for out of their own funds.
Upon the whole case the plaintiff is entitled to recover as follows: On claim no. 2 the sum of $1,000.00 for the Government’s failure to furnish a blacksmith for the period from-September 30,1844, to February 15,1846, in accordance with-the provisions of article 4 of the treaty of 1825; and on claim no. 4 the sum of $101,751.31 because of the failure of the Government to dispose of and account to the plaintiff for the value of 7,916.75 acres of land in accordance with the provisions of article 5 of the treaty of 1825, or a total sum of $102,524.65.
counterclaim
The jurisdictional act provides that the court “ shall also hear, examine, consider, and adjudicate any claims which the United States may have against said Kansas or Kaw Tribe of Indians, but any payment, including gratuities, * * * may be pleaded as an offset in such suit.”
During the period from June 3, 1825, to June 30, 1928, the United States expended for the benefit of the plaintiff tribe the sum of $449,236.33 over and above the amount it was obligated to expend, by treaty or otherwise. From 1874 to 1903 the plaintiff agency was under the jurisdiction of the Osage Agency; from 1913 to 1919 under the jurisdiction of the Ponca Agency; and from 1920 to 1928 under the jurisdiction of the Pawnee Agency. During this period the United States expended for the joint benefit of the tribes attached to these agencies, over and above the amount it was obligated to expend by treaty or otherwise, the sum of $72,159.51, the amount chargeable to the plaintiff tribe on a percentage of population basis being $12,809.32. These expenditures were gratuities, and as such are proper offsets against the amount the plaintiff is entitled to recover on its claims. The gratuity expenditures, $462,045.65, being in ex *325 cess of the amount the plaintiff is entitled to recover, $102,-524.65, it follows that the plaintiff is not entitled to judgment in any amount. The petition is accordingly dismissed.
It is so ordered.
Whaley, Judge; Littleton, Judge; Gkeen, Judge; and Booth, Chief Justice, concur.