Graham, Judge,
delivered the opinion of court:
This suit rests upon a special act of Congress dated February 6, 1921, 41 Stat. 1097, submitting to this court the claim *77 of the Osage Tribe of Indians against the United States for moneys due and arising out of the sale of Osage land under, the treaty of September 29, 1865, proclaimed January 21, 1867, 14 Stat. 687, for the amount due or claimed to be due the said tribe from the United States for the misappropriation of any funds of said tribe, or the failure of the United States to pay the tribe any money due under said treaty, with jurisdiction to hear and determine said claim as therein provided, notwithstanding the lapse of time or the statute of limitations, and also any legal or equitable defense or set-off or counterclaim which the United States may have against said tribe.
At the time of the negotiation of the said treaty of September 29, 1865, there were two parts of the Osage Tribe of Indians, known commonly as the Southern Osages and the Northern Osages. Apparently the former were located in the State of Arkansas and the latter in the State of Kansas. They were with few exceptions full-blooded blanket Indians, having but little intercourse with the whites, except as they came in touch with them in the sale of their products of the chase, skins of animals, etc.
At the time of the making of the treaty practically none of these full-blooded blanket Indians could read, write, or understand the English language. The tribe was very poor and in very needy circumstances. Its members lived mostly by the chase, and the animals of the chase were rapidly disappearing. The affairs of the tribe were entirely in the hands of the full-bloods, who occupied all the positions of leadership. In the Civil War they had been loyal to the Union and had furnished about 240 men from the ranks.
What preliminary negotiations took place leading up to the execution of said treaty do not appear — that is to say, how the purchase price and the acreage and location of the land were agreed upon, and with whom. A treaty prepared in advance by the representatives of the United States was presented for consideration, first at a meeting of the Southern Osages at Fort Smith, Arkansas, and afterwards to the Northern Osages at Canville trading post in Kansas. The interpreters for the Indians on both occasions were two half *78 breed Osages, one interpreting at one place and one at the other. It does not appear what qualifications these two men had as interpreters. The time consumed in explaining and executing the treaty at Fort Smith does not appear. The time consumed at Canville trading post in negotiating and signing was three hours.
All of the signers of the treaty at both places were full-blood Indians, who did not understand English, could not write their names, and signed with a mark, with the exception of George or Little Beaver, who may have understood English. While certain of these Indians appear on the treaty as having signed at Fort Smith, it would seem from the acknowledgment of their signatures that they did not sign at the time of the said meeting at Forth Smith for the approval of the treaty.
The vocabulary, if such we may call it, of the Osages was very limited, and it is a question whether it was possible for an interpreter to explain to these blanket Indians so that they would understand this treaty of seventeen articles, covering seven or eight printed pages, at least in three hours.
The Osage language comprises very few root words, which with derivatives made upwards of a thousand words in the language at that time. It has no word which is the equivalent of “ civilization ” or one which is the equivalent of “ fund,” but it was possible to explain “ civilization fund ” so that it could be fairly understood. To describe Indian tribes, meaning other tribes as well as the Osages, it was necessary to enumerate specific tribes known as the Osages, or designate the Osages, and use the words signifying “ other than ” or “ foreign,” which in the Osage language are words of insult.
At the time the treaty was negotiated the Osages were hostile to certain other tribes, among them the Pawnees, Cheyennes, and the Cherokees, and would not knowingly have agreed to part with any of their funds for the benefit of such hostile tribes. It is fair to assume that they interpreted the words “ Indian tribes ” to mean the tribe of the Great and Little Osage Indians to the exclusion of other tribes. The civilization fund which was created by the *79 treaty did not come into existence until 1873, at which time the first moneys came into the Treasury. There is no other instance in connection with treaties by the United States with the Indians where the United States has applied or undertaken to apply the proceeds of sales of lands of one tribe to the benefit of another.
When these Indians learned in 1876 that the civilization fund was being used for the benefit of Indians other than the Usages, they protested to their agent, Cyrus Beede, who wrote at that time to the Government voicing this protest and dissatisfaction, and from that time on the Osages .steadfastly complained against the interpretation given the treaty, and have employed counsel to aid them.
The treaty contains the following language, which embraces the bone of contention here:
“ART. I. * * * said lands shall be surveyed and •sold * * * for cash * * *; and after reimbursing the United States the cost of said survey and sale and the ;said sum of $300,000 placed to the credit of said Indians, the remaining proceeds shall be placed in the Treasury of the United States to the credit of the ‘ civilization fund,’ to be used, under the direction of the Secretary of the Interior, .for the education and civilization of Indian tribes residing within the limits of the United States.”
The treaty granted, sold, and conveyed to the United .States a tract of land 30 by 50 miles in extent, and the consideration for said grant and sale was the payment of $300,000, the amount to be placed to the credit of the tribe in the United States Treasury, and interest to be-allowed thereon at 5%, to be paid to the Indians semiannually. It then provided that after the sale of the land by the Government, any surplus remaining after the payment of the '.$300,000 and the cost of survey and sale, should be placed in the Treasury of the United States as stated above, as a “ civilization fund ” for the “ education and civilization ” of Indian tribes residing within the limits of the United States.
There is nothing to show what preliminary negotiations, if any, took place at which the terms of this treaty were agreed upon. It was brought already prepared to the meetings of the Indians at Fort Smith, Ark., and Canville trading *80 post, Kansas, where the two branches of the Osages, respectively, lived. However this may be, the treaty was a sale and conveyance of the land for the sum of $300,000, and the land thereby became the property of the United States Government. By its terms it was obligated only to pay to the Indians the sum of $300,000, and there is no dispute about the fact that it did this. Any surplus proceeds which might arise from the sale would therefore, under the treaty, become the property of the United States Government, and had it not gratuitously devoted this surplus to a “ civilization fund ” for the civilization and education of Indian tribes, there could have been no question raised such as is raised here.
But the language of the treaty is unambiguous. Its meaning is clear without the aid of extraneous facts. The fund here was to be devoted “ to the education and civilization of Indian tribes residing within the limits of the United States.” In order to make this language apply exclusively to the Osage Indians, the whole meaning of it would have to be changed by the inclusion of additional words. It is not the province of this court to reform treaties or to make new treaties for the parties. That is the function and province of the political department of the Government. Creek Nation v. United States, 63 C. Cls. 270, 272, 273; United States v. Choctaw, etc., Nations, 179 U. S. 494, 535.
While the language of the act “ to hear and determine, as right and justice may require, and as upon a full and fair arbitration, the claim of said tribe against the United States,” etc., has a wide scope, we are of opinion that it does not authorize this court to go beyond the limits which the courts have set in cases where a court has had to deal with treaties.
In the case of the Sisseton & Wahpeton Indians v. United States, 58 C. Cls. 302, 329, where a certiorari to this court was recently denied by the Supreme Court, the question involved was mutual mistake as to the amount of land covered by the cession, and it was contended that the court had authority under the facts and the jurisdictional act to re *81 form the treaty, this court said, quoting from the Old Settlers case, 148 U. S. 427, 468:
“ Unquestionably a treaty may be modified or abrogated by an act of Congress, but the power to make and unmake is essentially political and not judicial, and the presumption is wholly inadmissible that Congress sought in this instance to submit the good faith of its action or the action of the Government to judicial decisions by authorizing the stipulations in question to be overthrown upon an inquiry of the character suggested, and the act does not in the least degree justify any such inference.”
This court has no jurisdiction to inquire into the inequity or impropriety of treaties between the Indians and the United States. Otoe & Missouria, Indians v. United States, 52 C. Cls. 424, 429. The jurisdictional act makes no admission of liability, or of any ground of liability, on the part of the Government, but simply provides a forum for the adjudication of the claim according to applicable legal principles, and does not provide for a recovery upon a merely moral obligation. Its construction must and can only rest upon a construction of the pertinent statutes and treaties giving effect to their plain import. Mille Lac case, 229 U. S. 498, 500.
The treaty before this court, and even on appeal to the United States Supreme Court, would still remain and must remain a part of the supreme law of the land, and no court, either of law or equity, in this country can declare that it was procured by fraud or duress or mistake and treat it as inoperative. Old Settlers case, 27 C. Cls. 1, 36.
In the Muskrat case, 219 U. S. 346, 352, the Supreme Court said:
“ That neither the legislative nor the executive branches can constitutionally assign to the judicial any duties but such as are properly judicial, and to be performed in a judicial manner.”
The judicial duties of this court do not extend to reforming, amending, or making over a treaty, and where, as in this case, its language is unambiguous, however much the facts may appeal to the ethical sense of the court, it has no option but to enforce the treaty as it finds it. It is therefore of *82 the opinion that the claim asserted here by the plaintiff can not be sustained, and that the defendant is not liable to the plaintiff in any amount under the treaty.
We conclude that the Osage Tribe of Indians, under the language and meaning of said treaty, have not established a claim or right in the fund or moneys arising from the sale of the Osage lands under said treaty, and that the United States has not wrongfully appropriated any part or parcel of the lands or the funds of said Osage Tribe of Indians under said treaty.
We are of the opinion that the act did not contemplate that the court should consider or make allowance for counterclaims where the conclusion of the court was against the claim of the O.sage Tribe of Indians, and therefore, as the conclusion is against the claim, no further consideration should be given to the counterclaims. It may, however, be well to state that as to the counterclaims the special act directed consideration only to counterclaims against the Osage Tribe and not against individuals of the tribe. In this view of the matter, counterclaims Nos. 8 and 9, being for expenditures for education of individual Indians at schools, are not within the meaning of the special act, and could not be considered in any event as an offset against the Osage Indians as a tribe.
As to counterclaims Nos. 4, 5, 6, and 7, the findings show that they are not satisfactorily established and would in any event be rejected. The other three counterclaims, some of which are over a century old, in the light of the character of the expenditures and the conduct of the Government, should be treated as gratuities, and apparently were so regarded by the Government. Gratuities can not be recovered in this court, and could only be considered here in connection with the special provisions of the enabling act as set-offs in case of an allowance of plaintiff’s claim.
Judgment should be entered in favor of the defendant and against the plaintiff, and it is so ordered.
The counterclaims are disallowed and dismissed.
G-REEN, Judge; Moss, Judge; and Booth, Chief Justice, concur. ■