[No. 41822.    En Banc.    May 4, 1972.]

THE DEPARTMENT OF GAME, *Respondent and Cross-appellant*, THE DEPARTMENT OF FISHERIES, *Appellant*, v. THE PUYALLUP TRIBE, INC., *et al.*, *Respondents and Cross-appellants*.

562

*Slade Gorton, Attorney General,* and *William M. Gingery, Assistant,* for appellant Department of Fisheries.

*Slade Gorton, Attorney General,* and *J. L. Coniff, Assistant,* for respondent Department of Game.

*Shiro Kashiwa, Assistant Attorney General of the United States; Stan Pitkin, United States Attorney,* and *Jerald E. Olson, Assistant;* and *Robert S. Lynch* and *Thomas L. Adams, Jr.,* for respondent The Puyallup Tribe.

*Wettrick, Toulouse, Lirhus & Hove, Arnold J. Barer,* and *Malcolm S. McLeod,* for respondents Siddle et al.

*John H. Sennhauser,* for respondent Bennett.

HUNTER, J.—This appeal arises from a disposition by the

trial court of a remand by this court in the case of *Department of Game v. Puyallup Tribe, Inc.*, 70 Wn.2d 245, 422 P.2d 754 (1967).[1]

The action was instituted in the Superior Court for Pierce County in 1963 by the Department of Fisheries of the State of Washington (appellant) and the Department of Game of the State of Washington (respondent and cross-appellant), seeking by declaratory judgment to determine whether certain named individuals as members of the Puyallup Indian Tribe and the Puyallup Tribe (respondents and cross-appellants) were immune from the application of state conservation measures under their claimed rights to fish for anadromous fish in the Puyallup River under article 3 of the Treaty of Medicine Creek (10 Stat. 1132), which is as follows:

> The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses on open and unclaimed lands: *Provided, however,* That they shall not take shell fish from any beds staked or cultivated by citizens, and that they shall alter all stallions not intended for breeding horses, and shall keep up and confine the latter.

The Department of Fisheries and the Department of Game further sought a permanent injunction restraining the members of the tribe, and the tribe, from violating any fishing laws of this state or conservation regulations promulgated thereunder.

The trial court concluded that the Puyallup Tribe no longer existed as an entity and that its members no longer had any rights under the treaty; that there was no longer a

---

[1] As stated in footnote "1" of the original case, "The case caption is erroneous, there being no entity known as 'The Puyallup Tribe, Inc., a corporation.' The Puyallup Tribe of Indians did appear and answer by and through the chairman of the Tribal Council." *Department of Game,* 70 Wn.2d 247 n.1.

Puyallup Indian Reservation and that the Puyallup Indians had no fishing rights within what had been the reservation; that they were subject to state conservation laws and regulations as were all citizens, and the court permanently enjoined the defendants and all members of the "Puyallup Tribe" from fishing in the Puyallup River watershed and Commencement Bay in any manner contrary to the laws of the State of Washington, or to the rules and regulations of the departments.

Upon appeal to this court in that case, we held in summary in *Department of Game v. Puyallup Tribe, Inc., supra,* at 260:

*In summary:* We have rejected the Departments' argument that the Indian treaties are of no force and effect and that the state may repudiate them at will.

We have ruled that the trial court had no jurisdiction to determine whether or not there had been a termination of the Puyallup Indian Tribe, and that the tribe continues to exist, at least so long as it is recognized as such by the appropriate agencies of the United States, or until Congress passes a termination act.

We have agreed with the trial court that there is no longer a Puyallup Indian Reservation, and that the Puyallup Indians no longer have any special or treaty rights to fish thereon because it was once a reservation; however, we hold that they continue to have a right to fish at usual and accustomed grounds and stations and that any regulations of the Departments limiting or restricting those rights must be reasonable and necessary for the preservation of the fishery.

The state has clearly met that test, at least to the extent that it has established that continued use by the defendants of their drift nets and set nets would result in the nearly complete destruction of the anadromous fish runs in the Puyallup River and that a regulation prohibiting the use of such nets was necessary for the preservation of the fishery.

We are, therefore, in accord with the conclusion of the trial court that an injunction should be entered in this case; however, the injunction entered by the trial court is much too broad. It permanently enjoins individual defendants and members of the federal organization known as the "Puyallup Tribe" from fishing in the Puyallup

River watershed and Commencement Bay in any manner that is contrary to the rules and regulations of the Department of Fisheries of the State of Washington and the Department of Game of the State of Washington. It is predicated on the trial court's determination that the defendants have no treaty rights.

The cause must be remanded to the trial court for the entry of a judgment and decree predicated upon the proposition that the defendants do have treaty rights, but that they are subject to conservation regulations which are reasonable and necessary to preserve the fishery.

The essence of this opinion is—and the decree, as reframed, should so reflect: (1) If a defendant proves that he is a member of the Puyallup Tribe; and (2) He is fishing at one of the usual and accustomed fishing places of that tribe; (3) He cannot be restrained or enjoined from doing so, unless he is violating a statute, or regulation of the Departments promulgated thereunder, which has been established to be reasonable and necessary for the conservation of the fishery.

The injunction should be tailored to the particular situation. A specific act or acts should be enjoined on the basis that there has been a violation of a statute or statutes, or a regulation or regulations promulgated thereunder, and that such regulation or regulations are reasonable and necessary for the preservation of the fishery. The findings, conclusions, and judgment in this case should be rewritten to show clearly the basis and the extent of the injunction.

The judgment and decree appealed from is set aside, and the cause is remanded for the purposes indicated in this opinion.

The United States Supreme Court granted certiorari in this case, *Puyallup Tribe v. Department of Game*, 391 U.S. 392, 20 L. Ed. 2d 689, 88 S. Ct. 1725 (1968), and unanimously affirmed this court on May 27, 1968, with the following conclusion, at page 401:

Whether the prohibition of the use of set nets in these fresh waters was a "reasonable and necessary" (70 Wash. 2d, at 261, 422 P. 2d, at 764) conservation measure was left for determination by the trial court when the Supreme Court, deeming the injunction in No. 247 too broad, remanded the case for further findings. When the

case was argued here, much was said about the *pros* and the *cons* of that issue. Since the state court has given us no authoritative answer to the question, we leave it unanswered and only add that any ultimate findings on the conservation issue must also cover the issue of equal protection implicit in the phrase "in common with."

(Footnotes omitted.)

The remand trial in the superior court commenced on September 21, 1970.

In the meantime, the Department of Fisheries took action which they considered was consistent with our decision in *Puyallup* and with the decision of the United States Supreme Court, by limiting the commercial net fishery in the East Bay Pass area of Puget Sound to permit a larger escapement of salmon for the Puyallup River, and adopted regulations to permit a Puyallup Indian fishery in the Puyallup River. These respective regulations were the following:

(121) WAC 220-47-040 and WAC 220-47-060 as last amended are superseded in part by the following emergency regulation:

It shall be unlawful to take, fish for and possess salmon taken with purse seine and gill net gear in that portion of Puget Sound Salmon Fishing Area 6 lying between lines projected from Point Robinson Light to Des Moines Light and from Browns Point Light to Piner Point on Maury Island from 9:00 a.m. September 18 until further notice.

Section 3. This Order shall take effect as required by R.C.W. 34.04.040.

Dated this 18th Day of September, 1970.

*WAC 220-47-115* ——————PUYALLUP RIVER — INDIAN FISHERY.

It shall be unlawful to take, fish for or possess salmon taken for commercial purposes in waters of the Puyallup River and its tributaries, except that it shall be lawful for enrolled members of the Puyallup Indian tribe to take, fish for and possess salmon taken for commercial purposes with gill net and set net gear in that portion of the Puyallup River lying between the City of Puyallup and the 11th Street Bridge, in Tacoma, during the period

September 21 through October 23, 1970, subject to the following regulations:

(1) It shall be unlawful to engage in this fishery during weekly closures from 6:00 p.m. Wednesday to 6:00 p.m. Sunday.

(2) It shall be unlawful to engage in this fishery with any set net extending more than ⅓ the width of the river.

(3) It shall be unlawful to engage in this fishery with gill net gear containing mesh larger than 6½ inches stretch measure.

(4) It shall be unlawful for any person fishing pursuant to these regulations to fish for salmon with net gear in any manner, time or place contrary to these regulations.

Evidence introduced by the Department of Fisheries at the trial on remand, was in justification of the action of the department as being within the ambit of conservation of the salmon fishery as related to the run in the Puyallup River for the year 1970.

The Department of Game failed to recognize any right of the Puyallup Indians under the Medicine Creek Treaty, other than their right to fish in the same manner and in common with other citizens of the state. The Department of Game introduced evidence to show that a commercial net fishery would be inconsistent with the conservation of the steelhead fishery.

The trial court dissolved the injunction against the members of the Puyallup Indians and the tribe on the grounds there was no showing of irreparable injury; that adequate criminal sanctions were available, and on the grounds that the granting of the injunction would deprive those in violation of their right to a jury trial. The trial court further held that the burden was upon the state to prove the regulations were reasonable and necessary for the conservation of the fishery.

The Department of Fisheries appeals from the dismissal of the injunction, and from the holding of the trial court limiting the enforcement of its regulations to criminal sanctions, and the placing of the burden of proof upon the state

to show the regulations were reasonable and necessary for the conservation of the fishery in each case.

The Department of Game appeals from the order dissolving the injunction, contending that the defendants have no treaty rights to fish contrary to the conservation statutes and the regulations adopted thereunder, and that the trial court erred in failing to hold that the steelhead fishery could not withstand a commercial fishery.

The Puyallup Indian Tribe and individual members' (respondents and cross-appellants) contentions will be stated in the latter part of this opinion.

In considering the Puyallup Indians' treaty rights to fish under the Medicine Creek Treaty, since the decision of the United States Supreme Court, 391 U.S. 392, in its review of our decision in *Puyallup,* there can no longer be any question that whatever the United States Supreme Court may ultimately construe to be the Indian rights to fish under the Medicine Creek Treaty, they are subject to the reach of the state powers and regulations necessary to the conservation of the fishery, providing the regulations are not discriminatory against the Indians. The United States Supreme Court stated in *Puyallup,* on page 398:

> But the Treaty is silent as to the mode or modes of fishing that are guaranteed. Moreover, the right to fish at those respective places is not an exclusive one. Rather, it is one "in common with all citizens of the Territory." *Certainly the right of the latter may be regulated. And we see no reason why the right of the Indians may not also be regulated by an appropriate exercise of the police power of the State.* The right to fish "at all usual and accustomed" places may, of course, not be qualified by the State, even though all Indians born in the United States are now citizens of the United States. Act of June 2, 1924, 43 Stat. 253, as superseded by § 201 (b) of the Nationality Act of 1940, 8 U. S. C. § 1401 (a)(2). *But the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians.*

In *Tulee v. Washington,* 315 U. S. 681, we had before us

for construction a like treaty with the Yakima Indians which guaranteed the right to fish "at all usual and accustomed places, in common with the citizens" of Washington Territory. 12 Stat. 951. Tulee, a member of the tribe, was fishing without a license off the Yakima Indian Reservation; the State convicted him for failure to obtain a license. We reversed, saying:

> "[W]hile the treaty leaves the state with power to impose on Indians, equally with others, such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish, it forecloses the state from charging the Indians a fee of the kind in question here." *Id.*, at 684.
>
> *In other words, the "right" to fish outside the reservation was a treaty "right" that could not be qualified or conditioned by the State. But "the time and manner of fishing . . . . necessary for the conservation of fish," not being defined or established by the treaty, were within the reach of state power.*
>
> *The overriding police power of the State, expressed in nondiscriminatory measures for conserving fish resources, is preserved.*

(Italics ours.)

The first issue to be resolved is whether the regulations promulgated by the Department of Fisheries, to permit an Indian net fishery for coho salmon in the Puyallup River, come within the ambit of regulations conforming to the necessary conservation of the coho salmon fishery.

Conservation is defined by J. E. Lasater, Associate Director of Operations, Department of Fisheries, as follows:

> A. Very simply, it is wise use. When we put it in terms of salmon harvest, I would put it in three categories or three parts, by harvest, in management of salmon as a crop, *one,* there must be a surplus and over and above the needed spawning escapement to have an available crop and not be taking the feed stock. *Two,* the manner of fishing, itself, must be such that you can control it so that you do not dip into the seed stock. . . .
> *The other* thing is that the manner of fishing, itself, must not be destructive.

(Italics ours.)

Mr. Lasater testified that the first time there was a return of coho fish surplus over spawning and hatchery needs on the Puyallup since 1964, was in the fall of 1969, and that the 1970 regulation authorizing an Indian net fishery on the Puyallup permitted a harvest of the surplus and a sufficient escapement for spawning and hatchery needs. Mr. Lasater testified as follows:

A. They will fish three days a week each week, starting on the 21st until, in late October—   . . .   I have mentioned that we fish in areas of passage, that is so that in a closed period fish actually move out of the fishery, and protected the four days, are to allow the fish to come from the milling area, Commencement Bay, pass completely through the fishery and into the spawning areas above without being fished, and the four days, we believe, is sufficient to pass a significant quantity of fish. So it is to allow a spawning escapement through the fishery. You must allow them time to move.

From this uncontradicted testimony, there is ample evidence in the record to support the reasonableness of the regulations to meet necessary conservation standards for the Indian coho fishery alone. However, another problem arises. Mr. Lasater also testified that "chinook salmon in the Puyallup system have not been built back to a point where they can withstand a fishery without damaging the potential future runs."

The record shows that the manner of fishing in which the Indians engage for the catching of coho under the regulations, is with set or drift gill nets. In the recent case of *State v. Moses*, 79 Wn.2d 104, 483 P.2d 832 (1971), upon the basis of Mr. Lasater's testimony, we clearly determined that fish once caught or entangled in a gill net are injured to the extent that a very high mortality results. Thus, the coho gill net Indian fishery that results in the catch of other species of protected fish, such as chinook, to conform to necessary conservation requirements, cannot be permitted. It "flies" directly into Mr. Lasater's number three element of conservation—"The manner of fishing itself must not be destructive."

The record is not clear as to the number of chinook or other protected species of fish that are or will be caught in the gill nets during the period of Puyallup Indian coho fishery; however, it is clear that a selective gill net fishery, coho in this instance, cannot withstand the test of the necessary conservation of the fishery in the event substantial numbers of protected species are caught, resulting in a high percentage of their destruction and endangering the conservation of those protected species.

We therefore expressly hold that, as a guideline in an allowable Indian gill net fishery, a selective net fishery for the lawful catching of one species of fish is not permissible in the event there is a substantial number of protected species caught that are within the number required for spawning escapement and hatchery needs, necessary for conservation of the fishery of that species.

■ We will now consider the separate contentions of the Department of Game. The department contends that statutes prohibiting net fishing for steelhead are controlling in the prohibition of an Indian net fishery. This contention is without merit. Statutes of this state must yield to rights the Indians may have under the Medicine Creek Treaty.

■ The Department of Game further contends, however, that the Puyallup Indians have no fishing treaty rights other than those held in common with other citizens of the state. This contention is inconsistent with our holding in *Puyallup*. We hold that it is incumbent upon the Department of Game to provide, annually, regulations for a Puyallup Indian net fishery of steelhead when it is determined by the department, upon supporting facts and data, that an Indian net fishery would not be inconsistent with the necessary conservation of the steelhead fishery.

We are satisfied from the record in the present case, however, that a regulation authorizing an Indian net fishery for steelhead for the year 1970, in the Puyallup River, would have been destructive to the conservation of the steelhead fishery, and the Department of Game's contention

that there should be no commercial fishery in the Puyallup River for steelhead should be sustained as for that year.

Mr. Clifford J. Millenback, Chief of the Fisheries Management Division of the Department of Game, testified that the run of steelhead in the Puyallup River drainage is between 16,000 and 18,000 fish annually; that approximately 5,000 to 6,000 are native run which is the maximum the Puyallup system will produce even if undisturbed; that approximately 10,000 are produced by the annual hatchery plant of 100,000 smolt; that smolt, small steelhead from 6 to 9 inches in length, are released in April, and make their way to the sea about the first of August; that during this time all fishing is closed to permit their escapement; that the entire cost of the hatchery smolt plant, exclusive of some federal funds, is financed from licensee fees paid by sports fishermen. The record further shows that 61 per cent of the entire sports catch on the river is from hatchery-planted steelhead; that the catch of steelhead by the sports fishery, as determined from "card count" received from the licensed sports fishermen, is around 12,000 to 14,000 annually;[2] that the escapement required for adequate hatchery needs and spawning is 25 per cent to 50 per cent of the run; that the steelhead fishery cannot therefore withstand a commercial fishery on the Puyallup River.

Mr. Millenback further testified that, contrary to the salmon fishery, there is no commercial fishery of steelhead permitted; that the only fishing for steelhead is the sports fishery and that is primarily in the river itself.

We hold under this record that the steelhead fishery in the Puyallup River is not comparable to the salmon fishery; that (1) 61 per cent of the catch are hatchery fish, almost exclusively financed by licensee revenues of sports fisher-

---

[2]"DAILY CATCH AND POSSESSION LIMITS: Trout and *Steelhead*—Six pounds and 1 fish, not to exceed 12 fish but shall not include more than 2 steelhead over 20″ in length.

". . .

"ANNUAL CATCH LIMIT—STEELHEAD ONLY: Thirty steelhead over 20″ in length . . ." 1970 Game Fish Seasons and Catch Limits, 3 (Dep't of Game).

men; that (2) no commercial fishing for steelhead is permitted in any area; that (3) contrary to the salmon fishery, which is conducted almost entirely in areas other than in the river, the steelhead sports fishery of the Puyallup run is conducted almost exclusively in the Puyallup River; that (4) the catch of the steelhead sports fishery alone in the Puyallup River leaves no more than a sufficient number of steelhead for escapement necessary for the conservation of the steelhead fishery in that river.

The trial court was therefore in error in dissolving the injunction restricting a violation of steelhead fishing statutes and regulations as applied to the Puyallup River.

The Departments of Fisheries and Game contend the trial court erred in holding that injunction was not a proper form of remedy in this case. We agree. We clearly stated in *Puyallup* that an injunction should be entered in this case, but that it was too broad and should be tailored to meet the specific act or acts.

Puyallup River fish runs are for substantially short durations and it is vital to the conservation of the fishery that adequate escapement be permitted during these periods. The continuing threat of violation of net fishing prohibitions and regulations by members of the Puyallup Indian Tribe, relying upon their asserted treaty rights to virtually an unregulated net fishery, justifies the remedy of enforcement by injunction to adequately protect the conservation of the fishery.

The contention that the right of a jury trial is denied by the remedy of an injunction in this case, is without merit. The purpose of an injunction is not to punish the wrongdoer for past transactions, but to restrain present or threatened future wrongful acts. *Lewis Pac. Dairymen's Ass'n v. Turner*, 50 Wn.2d 762, 314 P.2d 625 (1957). Also, see, *State ex rel. Department of Pub. Works v. Skagit River Nav. & Trading Co.*, 181 Wash. 642, 45 P.2d 27 (1935). One who thereafter violates the injunction is subject to contempt proceedings and, under those circumstances, a jury trial is properly not available. *See People ex rel. Attorney*

*General v. Tool,* 35 Colo. 225, 86 P. 224 cited in *State ex rel. Nicomen Boom Co. v. North Shore Boom & Driving Co.,* 67 Wash. 317, 121 P. 467 (1912).

■   The Department of Fisheries contends that the trial court erred in its holding on the burden of proof in that the holding requires the department to mount a full scale conservation case and reestablish the necessity of its regulations in each and every enforcement action as part of its case in chief. The department argues that the burden of proof which is upon the state to show that its regulations are reasonable and necessary for the conservation of the fishery, when applied to Indian treaty fishing rights, must be met when the regulations are adopted in compliance with the notice and hearing provisions of the Administrative Procedure Act, RCW 34.04, and that thereafter a presumption of validity attaches. The burden of proof, it is contended, shifts back to the state upon a violation hearing involving a treaty Indian. We agree.

We hold that a presumption of validity attaches to a regulation once adopted under the procedure required by the Administrative Procedure Act. However, the right of a Puyallup Indian to assert his treaty rights at any time cannot be abridged. The unreasonableness of a regulation as a defense to a violation by a Puyallup Indian must be available at all times and, by reason of the advantage of the state in its expertise on fishing conservation issues, the burden must immediately shift to the state to establish that the regulation is supported by the evidence on grounds of being necessary for the conservation of the fishery.

■   The Puyallup Tribe and the individual members, Ramona Bennett, James Siddle and Robert Satiacum (respondents and cross-appellants), in essence, contend that their rights under the Medicine Creek Treaty are not sufficiently recognized; that the limitation of their taking fish is too broad; and that the alternative of limiting the catch in Puget Sound should be invoked before limiting the catch of the Indians. They cite the testimony of their expert witness, James L. Heckman, Associate Regional Supervisor of

the Division of Fishery Services with the Bureau of Sports Fisheries and Wild Life of the Department of the Interior. He supports these respondent/cross-appellants' alternative theory that fishing should be cut off in Puget Sound to permit greater escapement for the Puyallup fishery. This theory is obviously without substance as related to the Puyallup River fishery, until the Puyallup River's run can be identified. This was referred to in Mr. Lasater's testimony as "splitting off" where the run of the different classes of fish can be identified by their "splitting off" from the commingled runs prior to their entrance into the river in which they return to spawn.

The "splitting off" of the coho run for the Puyallup River at the East Bay Pass area was considered by the Department of Fisheries and the alternative theory of limiting the catch before the run reaches the river was recognized by its promulgation of regulation order No. 680, plaintiff's exhibit 5, prohibiting commercial net fishing in the East Bay Pass area.

The alternative theory of the Indian respondents and cross-appellants is wholly without merit as related to the steelhead because no net fishery or commercial fishery is permitted for steelhead in any area and for the further reason that substantially all the steelhead fishery occurs after their entrance into the respective rivers to which they return.

The Puyallup Tribe and individual member respondents and cross-appellants also contend the Department of Fisheries failed to assume its burden of proving the regulations were necessary for the conservation of the runs of the respective species. We have heretofore discussed and disposed of this issue in this opinion.

It is contended in the Indian respondents' and cross-appellants' briefs that the burden of proof is upon the Departments of Fisheries and Game to prove their regulations are reasonable and necessary for the conservation of the fishery prior to their becoming effective. We have also heretofore discussed and disposed of this contention.

■ It is also contended in briefs of the Indian respondents and cross-appellants that this case is moot. We must remember that this case was instituted under the declaratory judgment act, seeking guidelines for the adoption of continuing regulations, if any. It is therefore proper that all issues raised in this case be considered.

We have considered all of the arguments by the appellants, and respondents and cross-appellants not heretofore specifically mentioned and deem them resolved by our disposition of the contentions discussed in this opinion.

*In summary,* we hold:

(1) Puyallup Indian fishery regulations must be made each year supported upon facts and data that show the regulation is necessary for the conservation of the respective species of the anadromous fish in the Puyallup watershed;

(2) A selective gill net Puyallup Indian fishery cannot be allowed where a substantial number of species protected from the net fishery will be caught with those fish authorized to be taken, endangering the conservation of those protected species;

(3) The fishery regulations for coho in the year 1970 were reasonable, subject to the above limitation upon a selective Indian net fishery;

(4) This record does not support an Indian net fishery for the taking of steelhead for the year 1970;

(5) The alternative theory of cutting off fishing in Puget Sound to enhance the Puyallup River run of anadromous fish is unfeasible while species of anadromous fish are commingled prior to "splitting off" for return to watersheds in which they spawn;

(6) Injunction is the proper remedy for the enforcement of Indian fishery regulations in the instant case;

(7) A fishing regulation adopted under the Administrative Procedure Act will be presumed valid. The burden to prove the regulation was necessary for the conservation of the fishery will shift to the state upon its challenge, as a

defense by a Puyallup Indian, upon its violation, or upon an appropriate declaratory judgment proceeding.

The judgment of the trial court is reversed insofar as it is inconsistent with this opinion, and otherwise is affirmed. It is further ordered that the injunction be reinstated and the case remanded to the trial court for the appropriate modification of the injunction against the members of the Puyallup Indian Tribe, consistent with our holding in this opinion.

All parties will bear their own costs on this appeal.

HAMILTON, C.J., FINLEY, NEILL, STAFFORD, and WRIGHT, JJ., concur.

HALE, J. (dissenting)—There is, I perceive, a curious aura of romantic whimsy suffusing the law of Indian treaties. Indian treaty cases seem never quite fully to depart that peculiar genre of elemental melodrama compounded more of fantasy than fact, more of folklore than truth—all subject to the inevitable distortion of time and history—in order to reach a devoutly wished judicial consummation. Although this may make for good reading, it probably produces bad law. Inexorably inhering in these decisions on Indian treaties, I think, is the judicial conscience which aspires somehow to right what the courts think to be historical wrongs—even if the treaty is somehow twisted out of shape to achieve it. Thus, in Indian treaty law, the Indian occupies a traditionally exalted position; the pioneers and the government which encouraged them to settle and develop this Western frontier a correspondingly low one; and the treaties undergo an inevitable distortion in the process. The time must eventually come, however, when the courts will have to construe the Indian treaties as the parties intended and as common sense dictates. Whatever pangs of conscience the judiciary may have developed through the present century concerning treatment of the Indians more than a century ago at the hands of the citizenry, misconstruing the treaties is a poor means of expiation. Two wrongs do not make a right and the courts can-

not and ought not remedy such wrongs whether real or imagined by revising the treaties and inventing special rights in order to come up with a result which comports with the judiciary's ideas ex post facto of what the treaty should have said. If the treaties with the Indians did not afford treaty Indians exclusive rights or preferential privilege in the state's lakes, rivers, streams and bays, the courts ought not accord such preferential rights and privileges to their descendants.

Courts must accept the treaties as written and cannot alter or amend them. *Kansas or Kaw Tribe of Indians v. United States*, 80 Ct. Cl. 264 (1934), *cert. denied*, 296 U.S. 577, 80 L. Ed. 408, 56 S. Ct. 88 (1935); *Osage Tribe of Indians v. United States*, 66 Ct. Cl. 64 (1928), *appeal dismissed* and *cert. denied*, *Osage Indians v. United States*, 279 U.S. 811, 73 L. Ed. 971, 49 S. Ct. 251 (1929). If a treaty did not give the Indians special times and places in which to fish, the court is without power to write a new treaty giving their descendants such special privileges. Whatever rights Indians may once have possessed to treat with the United States as a contracting entity ended with the act of March 3, 1871, Rev. Stat. § 2079, 25 U.S.C. § 71, which abrogated the treaty-making power with the Indian nations and tribes.

Lacking the constitutional power to make treaties of any kind, the courts are equally without power to rewrite them from time to time or at all—even to achieve what the courts believe to be a good result. The judicial function is limited, I think, to enforcing and upholding the treaties according to their content and spirit. Accordingly, judicial process is not the medium nor is the courthouse the place to rectify the wrong, real or illusory, done to the Indians by the pioneers and the United States government more than a century ago. Any wrongs done the Indians, if genuine and shown to persist down through the generations, should be righted by the Congress.

The Treaty of Medicine Creek, negotiated in 1854 (Treaty With Nisqualli, Puyallup, Etc., 1854, 2 Indian Af-

fairs Laws and Treaties 495 (1902)), by the United States with a primitive people then under partial subjection to the war-declaring power of the Congress and the war-making power of the President, cannot be sensibly interpreted, I think, so as to award the descendants of these primitive people rights and privileges today in the state's waters not enjoyed in common by all of their fellow citizens of the state and the United States. The court's ruling, I fear, not only deprives citizens of the equal protection of the laws, but grants to some Indians as a class immunities and privileges not enjoyed by all citizens, including most Indians—all in violation of the Fourteenth Amendment.

A reading of the other treaties negotiated contemporaneously by Isaac I. Stevens with the Indians of the Pacific Northwest bears out, in my opinion, that the government of the United States, even before adoption of the Fourteenth Amendment, did not intend to disparage the citizen settlers' rights and correspondingly aggrandize Indians' rights, particularly during an era when the United States was encouraging the settlement and development of these Western territories by citizens; nor will it show a purpose to accord special off-reservation privileges to the Indians and their descendants.

Fishing is an art virtually as old as man; recorded history, anthropology and the Bible tell us so. By 1854, while there may have been little knowledge of and less apparent need for conservation of natural resources than today, the people of this country were undoubtedly aware of the great economic and social value of water resources. A century and a half of colonial history followed by two generations of national history could not help but impress upon the government and the pioneers the value of water as a highway for travel and commerce and its vital use in the production of food and fiber. They knew its importance, too, as a source of hydraulic power in manufacturing and as an indispensable resource in chemistry, irrigation, agriculture, and as a household necessity. A little common sense applied to the Indian treaties will reveal, I think, that the United States

did not intend to put Indians, when away from their reservation, in a superior position to that of the citizens of the territory with respect to the rivers, streams, lakes and tidal waters of the territory.

The Treaty of Medicine Creek itself is the best evidence of what it means for we have little else to go on. It was made between the United States and certain tribes and bands of Indians, signed by Isaac I. Stevens for the United States, December 26, 1854, ratified by the Senate March 3, 1855, and proclaimed by the President, April 10, 1855. Its explicit language that whatever off-reservation fishing rights the Indians may have are held "in common with all citizens of the Territory" (2 Indian Affairs Laws and Treaties 495 (1902), 10 Stat. 1132), is susceptible of no sensible interpretation other than that the Indians shall have no fishing rights that all citizens do not have and vice versa off the reservation. To make it mean something else requires an obvious distortion and misinterpretation.

This exact language of the treaty, incorporated as it was in other similar treaties contemporaneously negotiated with other tribes and bands, makes clear that the Indians were not to be excluded from fishing grounds off their reservation if the citizens of the territory were not excluded, but that these rights were to be coextensive only with those of the citizens of the territory. Article 3 of the Treaty of Medicine Creek as noted says:

> ARTICLE 3. The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses on open and unclaimed lands: *Provided, however,* That they shall not take shell-fish from any beds staked or cultivated by citizens, and that they shall alter all stallions not intended for breeding-horses, and shall keep up and confine the latter.

The entire treaty points to the same conclusion. In article 1, the Indians did "cede, relinquish, and convey to the

United States, all their right, title, and interest in and to the lands and country occupied by them." Article 2 reserved for their *present* use certain reservation lands. Article 4 provides that, in exchange for the cession of certain described lands, the United States pay to the signatory tribes $32,500 in installments or annuities; another payment of $3,250 under article 5 was to be paid to the Indians for expenses of removing to their reservation and "to clear, fence, and break up a sufficient quantity of land for cultivation." Had the Indians demanded and the government intended to grant them exclusive off-reservation rights to fishing, here was one of several logical places to say so.

The treaty was comprehensive and workable. Article 7 prohibited the annuities earlier described from being attached for individual debts; article 8 pledged the Indians to be friendly, refrain from making war, and refrain from concealing and protecting Indians who committed depradation against citizens of the territory. In article 9, the Indians acknowledged that they were "desirous to exclude from their reservations the use of ardent spirits, and to prevent their people from drinking the same" and agreed that any Indian who introduced liquor onto the reservation or who drank it stood to have his "proportion of the annuities withheld from him or her for such time as the President may determine."

Article 10 provided for the establishment of a general Indian agency by the United States government, and for free industrial and agricultural schools and the employment of "a physician to reside at the said central agency, who shall furnish medicine and advice to their sick, and shall vaccinate them; the expenses of the said school, shops, employees, and medical attendance, to be defrayed by the United States, and not deducted from the annuities."

Article 11, imposing higher moral standards upon the Indians than the government vouchsafed for the country at large, abolished slavery:

ARTICLE 11. The said tribes and bands agree to free

all slaves now held by them, and not to purchase or acquire others hereafter.

There is not a word in any of these articles, comprehensive as their contents were, nor in the other treaties, to suggest that either the Indians or the United States government intended that the Indian tribes and bands be accorded rights outside their reservations in the rivers, streams, lakes and Puget Sound superior to or not equally available to those of the citizens of the territory.

The fishing privileges contemplated by the Treaty of Medicine Creek were not unique. July 1, 1855, Isaac I. Stevens, acting for the United States, made a treaty with the Quinaielt, Quillehute and other tribes and bands. 2 Indian Affairs Laws and Treaties 539 (1902), 12 Stat. 971. That treaty employs identical language to the Treaty of Medicine Creek concerning off-reservation fishing privileges, stating explicitly in article 3, that "The right of taking fish at all usual and accustomed grounds and stations is secured . . . *in common with all citizens of the Territory.*" (Italics mine.)

Here, too, as in the Medicine Creek Treaty, had it been intended that the Indians were to acquire off-reservation hunting and fishing rights superior to those of the citizens of the territory, the treaty contains many articles where such provisions could logically have been made, including article 2 reserving for the Indians certain described lands for reservations "for their exclusive use" and declaring "no white man shall be permitted to reside thereon without permission of the tribe and of the superintendent of Indian affairs or Indian agent." In this as in the other treaties, the Indians agreed to "remove to and settle upon the [reservation] within one year," thus expressing an intention to put the treaty into early effect and to suit their actions to the words of the treaty.

Nor should we, in considering the Treaty of Medicine Creek, now before the court, overlook the Treaty of Point Elliott, 2 Indian Affairs Laws and Treaties 501 (1902), 12 Stat. 927, negotiated by Isaac I. Stevens at Mucklteoh, Jan-

uary 22, 1855, with the Dwamish, Suquamish and other tribes and bands. The Treaty of Point Elliott employs the very language appearing in the Treaty of Medicine Creek and in the treaty with the Quinaielt, Quillehute and other tribes and bands, stating in article 5:

ARTICLE 5. The right of taking fish at usual and accustomed grounds and stations *is further secured to said Indians in common with all citizens of the Territory,* and of erecting temporary houses for the purpose of curing, together with the privilege of hunting and gathering roots and berries on open and unclaimed lands. *Provided, however,* That they shall not take shell-fish from any beds staked or cultivated by citizens.

(Italics mine.)

The remaining provisions, nearly identical to those of the Medicine Creek Treaty now before us and to those of the treaty with the Quinaielt and other tribes, make no provision for special off-reservation fishing privileges. As with the Treaty of Medicine Creek and the treaty with the Quinaielt, Quillehute and other tribes and bands, the Treaty of Point Elliott contains not even a hint that the Indians or their descendants would acquire, even temporarily, much less forever, off-reservation fishing rights not to be held in common with the citizens of the territory.

Similarly, in the Treaty of Point-No-Point, 2 Indian Affairs Laws and Treaties 504 (1902), 12 Stat. 933, made by Isaac I. Stevens, January 26, 1855, on behalf of the United States with the S'Klallam and other tribes, article 4 declares that "The right of taking fish at usual and accustomed grounds and stations is further secured to said Indians, *in common with all citizens of the United States.*" (Italics mine.) Here one should note a minor departure from the language of the three other treaties, describing the settlers as citizens of the United States rather than as citizens of the territory. In this, as in the three other treaties, one cannot find any language from which exclusive off-reservation Indian fishing rights may be inferred. Elsewhere, the Treaty of Point-No-Point makes clear, as do the

other treaties, that the settler's cultivated lands, crops and animals are to be protected from Indian trespass, thus eliminating the inevitable claim that special off-reservation fishing rights carry with them correlative rights to go upon the private lands and riverbanks and break the settler's close.

Nothing in any of the four mentioned treaties suggests that the Indians reserved or were to be awarded hunting and fishing rights save "in common with all citizens of the territory." The United States, seeking to promote the development of this Western frontier, obviously did not intend to put the primitive peoples with whom it was negotiating in a vastly superior position to use and exploit the waters of the territory to that of the settlers whom the government was then trying to induce to settle here. Manifestly, the purpose of the United States was to secure to the settlers a fair degree of protection from marauding Indians, cut down on Indian depradation, and elevate the standard of living of these primitive peoples according to the standards of the day, and to prevent the settlers from cutting off the Indians' rights to fish in those places where the settler elected also to fish. Allowing exclusive on-reservation rights and common off-reservation rights was obviously designed to prevent discrimination against the Indian in fishing, to permit the Indian to fish where the settlers chose to fish, not to enhance the position of the Indian and his descendants with respect to fishing.

In essence, the treaties say no more about fishing than that off their reservation the Indians should not be barred from exploiting those natural uncultivated fish resources to the same extent that the settlers permitted themselves to exploit them. The treaties are not, in my opinion, sensibly susceptible of a converse reading that the Indians off their reservation can bar the citizens from fishing where the Indians had customarily fished.

On January 31, 1855, Isaac I. Stevens negotiated a treaty with the Makah at Neah Bay, 2 Indian Affairs Laws and Treaties 510 (1902), 12 Stat. 939, containing substantially

the same provisions as the other four mentioned treaties but with a significant enlargement of the Indians' fishing rights so as to include whaling and sealing:

ARTICLE 4.   The right *of taking fish and of whaling or sealing at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the United States,* and of erecting temporary houses for the purpose of curing, together with the privilege of hunting and gathering roots and berries on open and unclaimed lands: *Provided, however,* That they shall not take shell-fish from any beds staked or cultivated by citizens.

(Italics mine.)

Here, again, it should be noted, in common with all other treaties negotiated with the Indians in what has now become Washington state, the right of taking fish *is secured* to the Indians *in common with all citizens of the United States* and to the privilege of taking fish has been added in this particular treaty the privilege of taking whales and seals, but again only *in common with the citizens of the United States.*

Should this treaty of 1855 with the Makah be read so as to reserve to the Indians extraordinary rights of sealing and whaling not held by all citizens of the United States— that is, the right to take seals and whales under the treaty not only then but now? The court's interpretation of the Treaty of Medicine Creek when applied to the treaty with the Makah would mean, I think, that the Makah still possess whaling and sealing rights not held by all other citizens. Before giving this treaty with the Makah so absurd a construction, one should ponder possible international implications arising from it.

Other treaties contemporaneously negotiated with the Indians of the Pacific Northwest shed additional light on the meaning of the instant treaty and demonstrate that, where exclusive rights were intended, Indians and the government had no difficulty in saying so. Thus, in granting exclusive fishing rights to the Indians in waters in or bordering their reservations, explicit language was employed in a

treaty signed June 9, 1855, in the Walla Walla Valley at Camp Stevens between Isaac I. Stevens and the Walla Walla. 2 Indian Affairs Laws and Treaties 521 (1902), 12 Stat. 945. The treaty says, in article 1,

That *the exclusive right of taking fish in the streams running through and bordering said reservation is hereby secured to said Indians,* and at all other usual and accustomed stations in common with citizens of the United States, and of erecting suitable buildings for curing the same; the privilege of hunting, gathering roots and berries and pasturing their stock on unclaimed lands in common with citizens, is also secured to them.

(Italics mine.)

In the Walla Walla Treaty, the Indians and the United States elected to reserve to the Indians "the *exclusive* right of taking fish in the streams running through and bordering said reservation," and outside their reservation, in common with citizens of the United States, and they had no difficulty selecting the words admirably designed to convey that idea. (Italics mine.) One should note how the two ideas are placed side by side to effect a sublime clarity— first the exclusive right within and bordering the reservation, and then off the reservation, *at all usual and accustomed stations in common with citizens of the United States.* The most sophisticated and learned of counsel would be hard put today to express this agreement with more clarity or greater economy of words. The phrase "in common with citizens of the United States"—explicit, straightforward and concise—means, I hope, precisely what the words say, *i.e.,* the Indians and their descendants acquired no rights or privileges outside or bordering their reservations not enjoyed or to be enjoyed by all citizens of the United States.

These precise distinctions between exclusive and shared fishing rights—that is, on-reservation rights and those to be held in common with the citizens of the territory—were again made in the treaty with the Yakima, 2 Indian Affairs Laws and Treaties 524 (1902), 12 Stat. 951, signed on be-

half of the United States by Isaac I. Stevens, June 9, 1855, at Camp Stevens, Walla Walla Valley. That treaty with the Yakima in article 3, in pertinent part, reads:

> *The exclusive right of taking fish in all the streams, where running through or bordering said reservation,* is further secured to said confederated tribes and bands of Indians, *as also the right of taking fish at all usual and accustomed places, in common with the citizens of the Territory,* and of erecting temporary buildings for curing them; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land.

(Italics mine.)

As with the Walla Walla, this treaty by eloquent juxtaposition marks well the distinction between exclusive fishing rights in all streams running through or bordering the reservations, and in those shared rights and privileges in all other waters which are to be held in common with the citizens of the territory.

Nor is the language used in the Walla Walla and Yakima treaties to be treated as mere coincidence or fortuity, for an identical clause appears in the treaty with the Nez Perces, 2 Indian Affairs Laws and Treaties 528 (1902), 12 Stat. 957, signed by Isaac I. Stevens for the United States, June 11, 1855, at Camp Stevens in the Walla Walla Valley. This Nez Perce treaty too employed the same juxtaposition of language to vouchsafe to the Indians "exclusive right of taking fish in all the streams where running through or bordering said reservation," but off the reservations only "the right of taking fish at all usual and accustomed places in common with citizens of the Territory."

Thus, a reading of all of these treaties, negotiated as they were at about the time of the Treaty of Medicine Creek in 1854, makes clear, I think, that neither the Indians nor the government had any difficulty whatever in describing or understanding the idea of reserving to the Indians exclusive fishing rights upon or adjoining their reservations and allowing them fishing rights and privileges in common with the citizens in all other waters. Rights and privileges held

in common protected the Indians from invidious discrimination and exclusion in a treaty that at the same time protected the settlers' lands and crops and animals from trespass and damage.

The Treaty of Medicine Creek thus expressed a mutual purpose that the Indians and their descendants should retain off the reservations fishing rights in the state's lakes, rivers and streams and tidal waters only in common with and to be enjoyed by all citizens of the territory. On the reservation, the Indians' rights to fish were exclusive; off the reservation, the Indians shared them with the citizens of the territory. If the citizens could not fish, neither could the Indians.

I can reach no other sensible conclusion in the face of this clear and express language except by a process of extravagant judicial interpretation and resort to invention and innovation, amounting to the rewriting of the old or promulgation of a new treaty. The time has come at long last for the courts to brush away the fog, fantasy, folklore and mythology upon which I perceive these Indian treaty decisions appear to rest and to read the treaties as they were intended by both the Indians and the government to be read.

There is yet another reason why the treaties cannot be read to award off-reservation fishing rights to the descendants of the tribal signatories so as to give off-reservation rights not to be held or exercised in common by all other citizens. In 1868, long after these treaties were signed, the Fourteenth Amendment was adopted to prohibit the perpetration of political inequality. It expressly provides that "No state shall make *or enforce* any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state . . . deny to any person within its jurisdiction the equal protection of the laws." (Italics mine.) Presumably no class of citizens is to be excluded from its protection because of race, color, creed or national origin. For the purpose of this case, all of the claimant Indians in this case should be deemed citizens of

the United States and of the State of Washington. The court now reads the Treaty of Medicine Creek so as to abridge the privileges of all citizens other than descendants of the Puyallups by giving the latter the privilege of taking fish from the Puyallup River and at the same time denying to all other citizens of the state and the United States the equal protection of the laws to do the same thing. It will give to the descendants of the Puyallups special open seasons with special commercial gear, neither of which privilege is open to all others. The opinion thus not only violates the plain language of the treaty by granting to Indian citizens rights to fish not enjoyed in common by all other citizens of the state and nation, but also contravenes the express language and violates the spirit of the Fourteenth Amendment.

Finally, I agree that the record supports the trial court's finding that the Puyallup Tribe ceased to exist as a tribal entity; that its members no longer possessed any fishing rights whatever under that treaty; that the Puyallup Indian Reservation had long ago ceased to exist; and that the descendants of the Puyallup retained no fishing rights within the area that formerly comprised that reservation. The members of the Puyallup Tribe, Inc., a federal organization, as the trial court found, therefore, for these added reasons have no fishing rights not held in common with all of their fellow citizens of the State of Washington and of the United States.

ROSELLINI, J., concurs with HALE, J.

Petition for rehearing denied June 23, 1972.