# DEPARTMENT OF GAME OF WASHINGTON
## v. PUYALLUP TRIBE ET AL.

No. 72–481.   Argued October 10, 1973—Decided November 19, 1973*

DOUGLAS, J., delivered the opinion for a unanimous Court.   WHITE, J., filed a concurring opinion, in which BURGER, C. J., and STEWART, J., joined, *post*, p. 49.

*Joseph L. Coniff, Jr.,* Assistant Attorney General of Washington, argued the cause for petitioner in No. 72–481 and for respondent in No. 72–746.   With him on the brief was *Slade Gorton,* Attorney General.

*Harry R. Sachse* argued the cause for respondents in No. 72–481 and for petitioner in No. 72–746.   With him on the brief were *Solicitor General Griswold, Assistant Attorney General Johnson, Deputy Solicitor General Wallace, Edmund B. Clark,* and *Glen R. Goodsell.*†

---

*Together with No. 72–746, *Puyallup Tribe* v. *Department of Game of Washington,* also on certiorari to the same court.

†*Charles A. Hobbs* filed a brief for the National Congress of American Indians, Inc., et al. as *amici curiae* urging reversal in No. 72–746.   Briefs of *amici curiae* in both cases were filed by *James B. Hovis* for the Confederated Bands and Tribes of the Yakima Indian Nation, and by *David H. Getches* for Ramona C. Bennett et al.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

In 1963 the Department of Game and the Department of Fisheries of the State of Washington brought this action against the Puyallup Tribe and some of its members, claiming they were subject to the State's laws that prohibited net fishing at their usual and accustomed places and seeking to enjoin them from violating the State's fishing regulations. The Supreme Court of the State held that the tribe had protected fishing rights under the Treaty of Medicine Creek and that a member who was fishing at a usual and accustomed fishing place of the tribe may not be restrained or enjoined from doing so unless he is violating a state statute or regulation "which has been established to be reasonable and necessary for the conservation of the fishery." 70 Wash. 2d 245, 262, 422 P. 2d 754, 764.

On review of that decision we held that, as provided in the Treaty of Medicine Creek, the " 'right of taking fish, at all usual and accustomed grounds and stations [which] is . . . secured to said Indians, in common with all citizens of the Territory' " extends to off-reservation fishing but that "the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians." 391 U. S. 392, 395, 398. We found the state court decision had not clearly resolved the question whether barring the "use of set nets in fresh water streams or at their mouths" by all, including Indians, and allowing fishing only by hook and line in these areas was a reasonable and necessary conservation measure. The case was remanded for determination of that question and also "the issue of equal protection implicit in the phrase 'in common with' " as used in the Treaty. Id., at 400, 403.

In Washington the Department of Fisheries deals with salmon fishing, while steelhead trout are under the jurisdiction of the Department of Game. On our remand the Department of Fisheries changed its regulation to allow Indian net fishing for salmon in the Puyallup River (but not in the bay or in the spawning areas of the river). The Department of Game, however, continued its total prohibition of net fishing for steelhead trout. The Supreme Court of Washington upheld the regulations imposed by the Department of Fisheries which, as noted, were applicable to salmon; and no party has brought that ruling back here for review. The sole question tendered in the present cases concerns the regulations of the Department of Game concerning steelhead trout. We granted the petitions for certiorari. 410 U. S. 981.

The Supreme Court of Washington, while upholding the regulations of the Department of Game prohibiting fishing by net for steelhead in 1970, 80 Wash. 2d 561, 497 P. 2d 171, held (1) that new fishing regulations for the Tribe must be made each year, supported by "facts and data that show the regulation is necessary for the conservation" of the steelhead, *id.,* at 576, 497 P. 2d, at 180; (2) that the prohibition of net fishing for steelhead was proper because "the catch of the steelhead sports fishery alone in the Puyallup River leaves no more than a sufficient number of steelhead for escapement necessary for the conservation of the steelhead fishery in that river." *Id.,* at 573, 497 P. 2d, at 178–179.

The ban on all net fishing in the Puyallup River for steelhead [1] grants, in effect, the entire run to the sports

---

[1] "ANNUAL CATCH LIMIT—STEELHEAD ONLY: Thirty steelhead over 20″ in length . . . ." 1970 Game Fish Seasons and Catch Limits 3 (Dept. of Game). (Cited at 80 Wash. 2d 561, 572, 497 P. 2d 171, 178.)

fishermen. Whether that amounts to discrimination under the Treaty is the central question in these cases.

We know from the record and oral argument that the present run of steelhead trout is made possible by the planting of young steelhead trout called smolt and that the planting program is financed in large part by the license fees paid by the sports fishermen. The Washington Supreme Court said:

> "Mr. Clifford J. Millenbac[h], Chief of the Fisheries Management Division of the Department of Game, testified that the run of steelhead in the Puyallup River drainage is between 16,000 and 18,000 fish annually; that approximately 5,000 to 6,000 are native run which is the maximum the Puyallup system will produce even if undisturbed; that approximately 10,000 are produced by the annual hatchery plant of 100,000 smolt; that smolt, small steelhead from 6 to 9 inches in length, are released in April, and make their way to the sea about the first of August; that during this time all fishing is closed to permit their escapement; that the entire cost of the hatchery smolt plant, exclusive of some federal funds, is financed from license fees paid by sports fishermen. The record further shows that 61 per cent of the entire sports catch on the river is from hatchery-planted steelhead; that the catch of steelhead by the sports fishery, as determined from 'card count' received from the licensed sports fishermen, is around 12,000 to 14,000 annually;[2] that the escapement required for adequate hatchery needs and spawning is 25 per cent to 50 per cent of the run; that the steelhead fishery cannot therefore

---

[2] The Washington Supreme Court noted "that substantially all the steelhead fishery occurs after their entrance into the respective rivers to which they return." 80 Wash. 2d, at 575, 497 P. 2d, at 180.

withstand a commercial fishery on the Puyallup River." *Id.,* at 572, 497 P. 2d, at 178.

At oral argument counsel for the Department of Game represented that the catch of steelhead that were developed from the hatchery program was in one year 60% of the total run and in another 80%. And he stated that approximately 80% of the cost of that program was financed by the license fees of sports fishermen. Whether that issue will emerge in this ongoing litigation as a basis for allocating the catch between the two groups, we do not know. We mention it only to reserve decision on it.

At issue presently is the problem of accommodating net fishing by the Puyallups with conservation needs of the river. Our prior decision recognized that net fishing by these Indians for commercial purposes was covered by the Treaty. 391 U. S., at 398–399. We said that "the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation . . . does not discriminate against the Indians." *Id.,* at 398. There is discrimination here because all Indian net fishing is barred and only hook-and-line fishing entirely pre-empted by non-Indians, is allowed.

Only an expert could fairly estimate what degree of net fishing plus fishing by hook and line would allow the escapement of fish necessary for perpetuation of the species. If hook-and-line fishermen now catch all the steelhead which can be caught within the limits needed for escapement, then that number must in some manner be fairly apportioned between Indian net fishing and non-Indian sports fishing so far as that particular species is concerned. What formula should be employed is not for us to propose. There are many variables—the number of nets, the number of steelhead that can be caught with

nets, the places where nets can be located, the length of the net season, the frequency during the season when nets may be used. On the other side are the number of hook-and-line licenses that are issuable, the limits of the catch of each sports fisherman, the duration of the season for sports fishing, and the like.

The aim is to accommodate the rights of Indians under the Treaty and the rights of other people.

We do not imply that these fishing rights persist down to the very last steelhead in the river. Rights can be controlled by the need to conserve a species; and the time may come when the life of a steelhead is so precarious in a particular stream that all fishing should be banned until the species regains assurance of survival. The police power of the State is adequate to prevent the steelhead from following the fate of the passenger pigeon; and the Treaty does not give the Indians a federal right to pursue the last living steelhead until it enters their nets.

We reverse the judgment below insofar as it treats the steelhead problem and remand the cases for proceedings not inconsistent with this opinion.

*So ordered.*

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE and MR. JUSTICE STEWART join, concurring.

I agree that, consistently with the Treaty, commercial fishing by Indians cannot be totally forbidden in order to permit sports fishing in the usual volume. On the other hand, the Treaty does not obligate the State of Washington to subsidize the Indian fishery with planted fish paid for by sports fishermen. The opinion below, as I understand it, indicates that the river, left to its own devices, would have an annual run of 5,000 or 6,000 steelhead. It is only to this run that Indian Treaty rights

extend. Moreover, if there were no sports fishing and no state-planted steelhead, and if the State, as the Court said it could when this case was here before, may restrict commercial fishing in the interest of conservation, the Indian fishery cannot take so many fish that the natural run would suffer progressive depletion. Because the Court's opinion appears to leave room for this approach and for substantial, but fair, limits on the Indian commercial fishery, I am content to concur.